Dennis MILLS and David Mills,
Plaintiffs,

v.

AGRICHEMICAL AVIATION, INC., and
Gene Engel, Defendants.

Walter SMALL, Defendant, Third-Party
Plaintiff and Appellee,

v.

ST. PAUL FIRE AND MARINE INSUR-
ANCE COMPANY, Third-Party
Defendant and Appellant.

Civ. No. 9260.

Supreme Court of North Dakota.

Jan. 20, 1977.

As Amended Jan. 27, 1977.

Lundberg, Conmy, Nodland, Rosenberg, Lucas & Schulz, Bismarck, for third-party defendant and appellant; argued by A. Wm. Lucas, Bismarck.

Sperry & Schultz, Bismarck, for defendant, third-party plaintiff and appellee; argued by Alfred C. Schultz, Bismarck.

PEDERSON, Justice.

This is an appeal from a judgment by the Burleigh County District Court in a case tried to the court without a jury. Rule 52(a), North Dakota Rules of Civil Proce-

dure, applies insofar as findings of fact are concerned. The appellant is the St. Paul Fire and Marine Insurance Company, a third-party defendant, and the appellee is the third-party plaintiff, Walter Small. The judgment appealed from is based upon the following findings of fact and conclusions of law:

## "FINDINGS OF FACT

### "I.

"That the issues between the plaintiffs David Mills and Dennis Mills and Agrichemical Aviation Inc., Gene Engel and Walter Small were submitted to a jury for trial and that the jury on January 23, 1976, returned a verdict in favor of the plaintiffs Dennis Mills and David Mills and against the defendants and each of them, for damages arising as a result of crop spraying, in the sum of $7,655.00 without interest, and that the Court thereafter issued judgment in the sum of $7,655.00, plus costs in the sum of $188.40, for a total judgment in the amount of $7,843.40, in favor of the plaintiffs and against the defendants and each of them.

### "II.

"That the issues involving insurance coverage were tried to the Court on the basis of the files and records in the action, briefs of the parties, and the testimony and evidence presented on March 2, 1976.

### "III.

"That Walter Small purchased insurance from Evan Lips and Byron Anderson of the Murphy Insurance Agency and that the insurance coverage was provided by St. Paul Fire & Marine Insurance Company, which provided coverage for Small under various policies for a number of years; that this insurance coverage was increased from a basic policy to a personal catastrophe policy entitled 'Top Brass'.

### "IV.

"That Small did not read either of the two policies and relied upon the agent to provide coverage which would protect him from claims of third persons growing out of his farming and ranching operations.

### "V.

"That the intent of the Top Brass policy was to provide Small with additional protection, but that neither Mr. Lips nor Mr. Anderson explained to Small either the inclusions or exclusions of either policy or the extended coverage policy, and that discussions related to pecuniary limits of liability under the terms of the two policies.

### "VI.

"That premiums were paid on the extended coverage policy at the time that the policy application was executed by Small, but the policy itself was not actually delivered until some time later when the company approved of the application and mailed the policy from the home office for delivery to Small.

### "VII.

"That the insurance agency was unaware of the crop spraying operation on Small's land, until Small reported the plaintiffs' claim for damages.

### "VIII.

"That neither Small nor the agent for the insurance company discussed the matter of crop spraying at any time.

### "IX.

"That the insurer and the agency offered no form of policy or policy provisions which deals specifically with farming operations and therefore Small had no choice, either as to policy or policy provisions.

### "X.

"That Small believed that he was covered for all types of crop spraying, whether done by ground or aerial application and had been using aerial spraying of crops for approximately twenty years on his ranch and farm.

### "XI.

"That the claims of Small with the company made through the agency in the past had been paid without difficulty.

"XII.

"That the spraying of crops is an integral part of farming operations in this day and age.

"XIII.

"That it was Small's understanding that he was purchasing a liability policy providing him with liability protection in the essential functions of his farm operations, including his spraying operations.

"XIV.

"That Small was entitled to rely upon the policy as being fit for the purposes for which he purchased it under the Doctrine of Implied Warranty of Fitness. That it is the duty of the insurer, through its agents, to make known in the application that certain essential operations of the farm industry are not covered under the policy, should that be the case.

"XV.

"That Lips and Anderson are licensed agents for the third-party defendant company, St. Paul Fire and Marine Insurance Company and that the company negotiated a sale of its policy through the agents.

"XVI.

"That Small has contracted for and paid to the St. Paul Fire and Marine Insurance Company a premium for legal defense and the cost of legal defense under the policies involved and is entitled to judgment for the cost of defending the action against him in an amount to be determined by the Court.

"CONCLUSIONS OF LAW

"I.

"That Lips and Anderson are licensed agents for the St. Paul Fire and Marine Insurance Company and that the company negotiated a sale of its policy through its agents.

"II.

"That Walter Small is entitled to rely upon the policy issued as being for the purposes for which he purchased it and is entitled to coverage for damages arising as a result of crop spraying under the Doctrine of Implied Warranty of Fitness.

"III.

"That Walter Small is entitled to coverage, which the insured reasonably expected, under the Doctrine of Reasonable Expectations.

"IV.

"That the defendant and third-party plaintiff, Walter Small, is entitled to a judgment against the third-party defendant, St. Paul Fire and Marine Insurance Company, for the sum of $7,843.40 in addition to costs of defense to be determined and taxable costs to be retaxed on due notice."

It is not argued that any of the findings of fact are clearly erroneous; accordingly, we presume that they are all correct.

Appellant says the issues are:

1. Do the insurance policies, as written, provide coverage for liability based upon aerial spraying or use of aircraft by the insured, Walter Small?

2. Did the trial court err in creating a new contract for the parties, and in providing coverage for aerial spraying and use of aircraft, based upon the Doctrine of Reasonable Expectations and the Doctrine of Implied Warranty of Fitness?

Without comment upon appellant's statement of the issues, we conclude that the argument presented challenges the correctness of conclusions of law II and III.

In June 1971 Small employed Agrichemical Aviation, Inc., and Gene Engel, to aerial spray a portion of his crops. As a result of that operation, crops belonging to Dennis and David Mills were damaged. There are two insurance policies involved in the controversy, both written by St. Paul Fire and Marine Insurance Company and both acquired by Small through Murphy Insurance Agency. Small and his father before him have been long-time insurance clients of Murphy Insurance Agency. The basic comprehensive farm policy provided insurance protection for buildings and personal property owned by Small, and farmer's personal liability coverage up to $200,000. A second policy, entitled "Top Brass," was first purchased by Small in March 1971 and expand-

ed the limits of personal liability to $1,000,000.

There is no evidence in the record that the liability coverages in either policy were discussed beyond a statement of the amount. Exclusions were not discussed at any time prior to the loss encountered in this case.

Witnesses for Murphy Insurance indicated that the basic policy is called "Farmer's Comprehensive Insurance" and covers loss or damage to property by reason of fire, theft, windstorm, etc., plus farm and ranch liability. The "Top Brass" policy is a personal catastrophe liability policy only.

■ The basic comprehensive policy, under the heading "Insuring Agreements" and relating to the liability coverage only, contains this exclusion in subparagraph (h) of paragraph 1:

"This coverage does not apply:

.    .    .    .    .

"h. to property damage arising out of any substance released or discharged from any aircraft."

We find that language to be a clear and unambiguous exclusion.

■ The exclusion in the "Top Brass" policy is found in a paragraph entitled "Exclusions" and reads as follows:

"This Part shall not apply with respect to coverage (a):

.    .    .    .    .

"(b) to any liability arising out of the ownership, maintenance, operation or use, including loading or unloading, of any recreational motor vehicle or aircraft, except recreational motor vehicle or aircraft for which coverage is provided by an underlying policy listed in Schedule A and then not for broader coverage than is provided by such insurance."

In describing the difference in the language in the two exclusionary clauses relating to aircraft, Witness Anderson, an agent of Murphy Insurance, made the following remarks:

"I would assume there would be basically some difference, . . ." [referring to coverage of the two policies.]
". . . some areas covered [in Top Brass] that are not covered by underlying coverage, . . ."
"[Top Brass] expand the limits."
". . . throw in some extra protection."
"[The different language in the aircraft exclusion is] to expand the underlying coverage."

This testimony apparently confused the trial judge and he questioned Witness Anderson concerning the reasons for not using the same language in the two exclusions and received the following answer:

"This is excluded under the basic policy; it would be excluded under the expansion."

Witness Anderson admitted on further examination that even for experts in the insurance industry these policy provisions are difficult to interpret.

After considering in its memorandum opinion the exclusionary provisions found in the two policies, the trial court found that the basic policy exclusion is clear and unambiguous and that, while the exclusionary language in the "Top Brass" policy is somewhat ambiguous because it is unclear whether the word "recreational" modifies both "motor vehicle" and "aircraft," reference to the paragraph of the policy entitled "Definitions" in which the term "recreational motor vehicles" is separated from the term "aircraft" made it doubtful that any person reading the policy, in its entirety, could have been misled on the question of the extent of the exclusions. The court then concluded that since Small had read neither of the policies he could not have been misled, and all further argument on the issue of ambiguity could be dismissed.

If the trial court meant by this statement to say that a reasonable man would clearly and unhesitantly conclude, without any assistance from anyone accustomed to reading insurance policies, that both of the policies contained specific exclusions of coverage of

aerial spraying operations, then we must disagree. Persistence and study, not expected of a reasonably prudent buyer, would have led to the pertinent exclusions and a conclusion, at best, that the coverage was doubtful. The explanation made by Witness Anderson, however, raises additional doubts and confirms that even amongst insurance experts there is confusion in such matters.

If Small had examined the document which his counsel submitted to this Court, which appears in the appendix at A–37 and is labeled "Farm Policy," he would, first of all, have discovered the following:

> "PLEASE NOTE: This document is merely for the convenience of the Insured and is only a memorandum of the terms of the policy numbered hereon, as originally issued. It is not a policy nor any part thereof and confers no rights on the holder."

If that statement did not deter him from reading further, he would have found the following sixteen pages of "endorsements," "schedules," "declarations," "provisions applicable," "exclusions," "definitions," "extensions," "special limits," "special exclusions," and "special conditions," mostly in fine print. We, at this point, ask: Would he have searched through this morass or would he have been justified in saying to himself—"These agents are my friends and have sold insurance to me for years and to my father before me—they would have called it to my attention if I were not covered by liability insurance for all of my farm operations."

Quite obviously both policies must be read together and, when considered in the light of the explanations made by Witness Anderson, the relationship of the exclusionary clauses appears uncertain and perplexing. Liability coverage is expressed in four easily understood words: "Farm and ranch liability." Nearly every one of the sixteen pages of the basic policy and the twelve pages of the "Top Brass" policy contains literally hundreds of words that would "void" coverage, or explain items "not covered," or "limit" or "exclude" coverage.

The testimony of Witness Anderson indicates that the language of the "Top Brass" policy differs from the language of the basic policy because the form of the general "Top Brass" policy is intended to fit the needs of individuals engaged in a variety of occupations, while the farm policy is a specific farm liability policy. While this may serve as an explanation of the use of dissimilar exclusionary language, it cannot justify or mitigate resulting confusion. An insurer who selects standardized contracts and offers them to the insured on a "take-it-or-leave-it" basis, must assume responsibilities not only for disharmonious policy provisions but also for confusion created in the mind of a non-expert insured. The fact that Small admitted reading neither of these policies is not significant. Had he read them he likely would not have been enlightened. If an insured is bound to know the terms of the insurance contract he buys whether he reads it or not, he is also bound to be confused by ambiguous terms in those contracts whether he reads them or not. This Court cannot interpret the words of a contract for one who has read the words differently than for one who has not read them.

Going beyond the mere express words in the contracts, we have here a situation and a relationship wherein the obligation arose long before there was any opportunity to know what words would be in the contract. It is not unreasonable for a buyer to have a reasonable expectation that when he buys and pays for "farm liability" insurance, it will cover liability arising out of any of his normal farming operation, unless excluded operations are called to his attention. There is no dispute in the testimony that aerial spraying is a normal farming operation.

Over the years, the judiciary has experienced difficulty in rationally articulating the basis for the balancing it must do to perform its perceived duty to always do justice on the one hand and to protect "freedom of contract" on the other, in cases like this. In 1861, Sir Henry Maine wrote

his *Ancient Law* in which he referred to the movement in progressive societies "from status to contract."[1]

Professor Isaacs, in his writing on "Standardization of Contracts," examined what Sir Henry Maine had to say as well as some contributions by Dean Roscoe Pound from as early as 1909.[2] Isaacs was led to conclude that there was a pendulum movement back and forth: status to contract and contract to status. For example, marriage has variously been construed to be a sometimes status and sometimes contractual relationship. The consensual relationship between master and servant was, at one time, not governed at all by the terms of any labor contract but obligations arose out of the status of the relationship. Similarly, landlord-tenant obligations arose out of status rather than the rental contract terms. Historically, the making of many relationships did not depend upon contract at all. In fact, persons incapable of making contracts were still competent to be agents. Compare that with today when agency is thought of as being solely a contractual matter.

Dean Roscoe Pound, in "Liberty of Contract," 18 Yale L.J. 454 (1909), remarked upon the significance of duties and obligations arising out of the "nature of the relation." It has been said in a light vein that if one is omnipotent, he can afford to be magnanimous. In enforcing obligations arising out of status, the question becomes: "Shall the courts enforce magnanimity upon the omnipotent even against the specific term in a contract between one omnipotent and one non-omnipotent?"

When the status of the parties is that of insured and insurer, we find that additional factors (other than standardized contract and status) have influenced the courts.

Illustrative of an inherent mistrust factor is found in the New Hampshire case of *Delancy v. Insurance Co.,* 52 N.H. Reports (Shirley Vol. IV) 581 (Rockingham June 1873), which scorchingly described the "mischief" of insurance companies "believed to exist," in the following terms:

". . . companies . . . were organized for the purpose of providing one or two of their officers, at head-quarters, with lucrative employment,—large compensation for light work,—not for the purpose of insuring property; for the payment of expenses, not of losses. . .

"The principal act of precaution was, to guard the company against liability for losses. Forms of applications and policies (like those used in this case), of a most complicated and elaborate structure, were prepared, and filled with covenants, exceptions, stipulations, provisos, rules, regulations, and conditions, rendering the policy void in a great number of contingencies. These provisions were of such bulk and character that they would not be understood by men in general, even if subjected to a careful and laborious study: by men in general, they were sure not to be studied at all. The study of them was rendered particularly unattractive, by a profuse intermixture of discourses on subjects in which a premium payer would have no interest. The compound, if read by him, would, unless he were an extraordinary man, be an inexplicable riddle, a mere flood of darkness and confusion. Some of the most material stipulations were concealed in a mass of rubbish, on the back side of the policy and the following page, where few would expect to find anything more than a dull appendix, and where scarcely anyone would think of looking for information so important as that the company claimed a special exemption from the operation of the general law of the land relating to the only business in which the company professed to be engaged. As if it were feared that, notwithstanding these dis-

---

1. Professor Nathan Isaacs ["The Standardizing of Contracts," 27 Yale L.J. 34, Part I (1917)], questioned the status-to-contract theory, even though it had generally been "gratefully ac-

cepted as a very useful summary of many phenomena encountered in legal history."

2. See Roscoe Pound, "Liberty of Contract," 18 Yale L.J. 454 (1909).

couraging circumstances, some extremely eccentric person might attempt to examine and understand the meaning of the involved and intricate net in which he was to be entangled, it was printed in such small type, and in lines so long and so crowded, that the perusal of it was made physically difficult, painful, and injurious. Seldom has the art of typography been so successfully diverted from the diffusion of knowledge to the suppression of it."

Although the above policy description may ring a bell of familiarity, we no longer look at insurance as a great evil. The insurance industry is a necessary and respected part of our civilization.

In more recent times some additional labels, if not additional theories, have crept into the picture. Some courts have found a tort obligation rather than one based upon contract, when, for example, an application for insurance is not acted upon by the insurer within a reasonable time and an uninsured loss occurs. Recovery *ex delicto* has been allowed because the public interest required it. See *Duffy v. Bankers' Life Ass'n of Des Moines,* 160 Iowa 19, 139 N.W. 1087 (1913).

This also appears to be the rationale of *Bekken v. Equitable Life Assur. Soc.,* 70 N.D. 122, 293 N.W. 200 (1940), where this Court found there was no contract because of the negligent failure of the insurer to promptly act upon the application of the insured.

*Bekken* explained the two views: one, that "insurance is a contract, which, like other contracts, results only from an offer and an acceptance of the offer"; and the other theory being that "in certain circumstances a legal duty arises, from the relationship created during the negotiations between an applicant for insurance and the insurance company."

Under the first view no duty arises unless and until a contract has been created, and then only in accordance with the specific words therein, while under the second view the company may, in the absence of any contract, be liable in tort for negligence. "They recognize the status and relationship of the parties, as they are, and measure the obligations of the parties accordingly." *Bekken v. Equitable Life Assur. Soc.,* 293 N.W. at 210, *supra.*

Some courts have severely criticized the "tort theory" applied to insurance contracts as being highly inconsistent and apt to undermine legal certainty and stability of the insurance industry. See *Savage v. Prudential Life Ins. Co.,* 154 Miss. 89, 121 So. 487 (1929).

■ If the status or relationship between the parties can create obligations prior to the entering into of a contract, then certainly status or relationship can be the basis of an obligation after an insurance contract has been entered into, and even when obligations appear to be in conflict with the terms of the contract.

■■ First of all, it has been well established in North Dakota that any ambiguity or reasonable doubt as to the meaning of a policy is to be construed strictly against the insurer and in favor of the insured, and if language in a policy will support an interpretation which will impose liability on the insurer and one which will not, the former interpretation will be adopted. *Nodak Mutual Insurance Company v. Loeffler,* 225 N.W.2d 290 (N.D.1974); *Conlin v. Dakota Fire Insurance Company,* 126 N.W.2d 421 (N.D.1964). Section 9–07–19, NDCC, provides in part:

"In cases of uncertainty not removed by the . . . rules, the language of a contract should be interpreted most strongly against the party who caused the uncertainty to exist. The promisor is presumed to be such party, . . ."

Some courts have invoked the Doctrine of Reasonable Expectations to impose liability upon insurers, sometimes with and sometimes without finding ambiguity in the terms of the contract.[3] We have not la-

---

**3.** The Idaho Supreme Court, in a divided opinion, in *Corgatelli v. Globe Life & Accident In-* *surance Co.,* 96 Idaho 616, 533 P.2d 737 (1975), illustrates the application of the Doctrine of

beled the applicable doctrine by that name; however, we have specifically adopted the Doctrine of Contract of Adhesion. See *Hughes v. State Farm Mut. Auto Ins. Co.,* 236 N.W.2d 870, 885 (N.D.1976), where we said:

"In interpreting the terms of a policy of insurance, we are guided by the familiar rule that, as an adhesion contract drawn by the company, it must be construed most strongly against the insurance company. *Scott v. National Travelers Life Insurance Co.,* 171 N.W.2d 749, 751 (N.D.1969); *Bekken v. Equitable Life Assur. Soc.,* 70 N.D. 122, 293 N.W. 200, 212 (1940); *State ex rel. Hagen, Etc. v. Bismarck Tire Ctr.,* 234 N.W.2d 224, 225–226 (N.D.1975) (discusses treatment by the courts of adhesion contracts)."[4]

■ The Doctrine of Reasonable Expectations has evolved as an interpretative tool to aid courts in discerning the intention of the parties bound by adhesion contracts. In *Steven v. Fidelity and Casualty Co. of New York,* 58 Cal.2d 862, 27 Cal.Rptr. 172, 176, 377 P.2d 284, 288 (1963), in construing a life insurance policy which the insured had purchased from a vending machine in an airport and immediately mailed to the beneficiary of the policy before reading it, the court said:

"In this type of standardized contract, sold by a vending machine, the insured may reasonably expect coverage for the whole trip which he inserted in the policy, including reasonable substituted transportation necessitated by emergency. If the insurer did not propose such coverage,

it should have plainly and clearly brought to the attention of the purchaser such limitation of liability."

It is difficult to significantly distinguish the situation in the *Steven* case where the buyer, although receiving the policy immediately, would not normally have had the time to study the terms of the policy, and the situation in our current case where not until two weeks after the purchase did the buyer have any opportunity to examine the policy at all.

Another significant statement of the Doctrine of Reasonable Expectations appears in *Gray v. Zurich Insurance Company,* 65 Cal.2d 263, 54 Cal.Rptr. 104, 107, 419 P.2d 168, 171 (1966):

"Although courts have long followed the basic precept that they would look to the words of the contract to find the meaning which the parties expected from them, they have also applied the doctrine of the adhesion contract to insurance policies, holding that in view of the disparate bargaining status of the parties we must ascertain that meaning of the contract which the insured would reasonably expect. Thus as Kessler stated in his classic article on adhesion contracts: 'In dealing with standardized contracts courts have to determine what the weaker contracting party could legitimately expect by way of services according to the enterpriser's "calling", and to what extent the stronger party disappointed reasonable expectations based on the typical life situation.' (Kessler, Contracts of Adhesion (1943) 43 Colum.L.Rev. 629, 637.)"

Reasonable Expectations where there is no ambiguity found. See the analysis of that case by Kenneth Carpenter in 12 Idaho L.Rev. 97 (1975). Sheldon T. Fleck, in a "Note" published in 24 Drake L.Rev. 853 (1975), analyzed *C & J Fert., Inc. v. Allied Mut. Ins. Co.,* 227 N.W.2d 169 (Iowa 1975), and aptly named his writing "Reasonable Expectations: The Insurer's Dilemma." E. Neil Young, John R. Lewis, and J. Finley Lee authored an article which explored the issue of insurance contract interpretation and the doctrines of law which are applicable, entitled "Insurance Contract Interpretation: Issues and Trends," published in 625 The Insurance L.J. 71 (1975). No research on the matter

is complete without consideration of the two "basic" documents: Friederich Kessler's "Contracts of Adhesion—Some Thoughts About Freedom of Contract," 43 Colum.L.Rev. 629 (1943), and Robert E. Keeton's "Insurance Law Rights at Variance with Policy Provisions," 83 Harvard L.Rev. 961 and 1281, Parts 1 and 2 (1970). See also, Restatement, Second, of Contracts, Sec. 237, "Standardized Agreements" (Tent. Draft No. 5, 1970).

4. See also, *Cargill, Inc. v. Kavanaugh,* 228 N.W.2d 133, syllabus 9 (N.D.1975); *Farmers Union Grain Terminal Ass'n v. Nelson,* 223 N.W.2d 494, syllabus 1 and 2 (N.D.1974).

672

When we apply the theory adopted in California in the *Steven* and *Gray* cases to the facts before us, we find that in each instance there is a standardized contract and, in each instance, there is a total lack of bargaining. In *Steven* the court appears to have found an obligation resting upon the failure of the insurer to bring to the attention of the insured the exclusion. In *Gray* there was ambiguity in the terms of the contract. In *Gray* the insurer refused to defend the insured on the ground that the incident was not covered by the policy, which covered personal liability but excluded intentional bodily injury, and the court found that the exclusionary clause was ambiguous. It does not appear at this time that the California rulings extend to the point that the Doctrine of Reasonable Expectations will be allowed to supersede clear and unambiguous language specifically called to the attention of the insured.

Professor K. N. Llewellyn, in 52 Harvard L.Rev. 700, 704 (1939), reviewed "The Standardization of Commercial Contracts in English and Continental Law" by O. Prausnitz of London.

Professor Llewellyn said:

". . . where bargaining is absent in fact, the conditions and clauses to be read into a bargain are not those which happen to be printed on the unread paper, but are those which a sane man might reasonably expect to find on that paper."

Would a reasonable man expect an airline trip coverage to cover his entire trip? Would an insured carrying bodily injury coverage expect to be covered when the bodily injury occurred in an altercation? Would a farmer reasonably expect coverage of all of his operation in a policy labeled "Farm Liability Policy"?

The lower court in our case based its decision upon an analysis of an Iowa decision cited by Small in his brief, *C & J Fert., Inc. v. Allied Mut. Ins. Co.*, 227 N.W.2d 169 (Iowa 1975).[5]

In that decision the Iowa Supreme Court held that even though the insurance policy provided coverage against burglary only when marks of force and violence were visible upon the exterior of the premises, the insured could nevertheless recover its loss when the only visible damage appeared on an interior door, (1) under the Doctrine of Reasonable Expectations, (2) on the theory of breach of implied warranty, and (3) because the liability-avoiding provision was unconscionable. Since our affirmance of Small's recovery rests securely upon the Doctrine of Reasonable Expectations, we deem it unnecessary to base our decision on these last theories, which are principally Uniform Commercial Code provisions relating to the sale of goods.

Much could be said about the similarity between insurance and the sale of services. Such analysis was not made in the lower court and it is not urged upon the appeal.

In the *C & J Fertilizer* case, the Iowa Supreme Court indicated, and other courts have explicitly held, that the Doctrine of Reasonable Expectations does not require as a condition precedent to its application as an interpretative tool a finding of ambiguity in the insurance policy. See *Corgatelli v. Globe Life & Accident Insurance Co.*, 96 Idaho 616, 533 P.2d 737 (1975); *Continental Insurance Company v. Bussell*, 498 P.2d 706 (Alaska 1972); *Gerhardt v. Continental Ins. Cos.*, 48 N.J. 291, 225 A.2d 328 (1966). We consider this interpretation of the Doctrine of Reasonable Expectations to be unnecessary in this instance, since we have previously determined that the insurance contracts in question, as explained by the insurance agent, contain patently ambiguous policy provisions.

We have recently construed the term "total disability" in a general disability insurance policy in a reasonable and practical manner, rather than literally or strictly, indicating, at least in principle, this Court's acceptance of the Doctrine of Reasonable Expectations. *Kooker v. Benefit Association of Railway Employees*, 246 N.W.2d 743

**5.** See *Lovas v. St. Paul Ins. Companies*, 240 N.W.2d 53, 58 (N.D.1976), where we commented on the principles of *C & J Fertilizer*, but neither approved nor disapproved the doctrine.

(N.D.1976). That case represents an instance in which this Court disallowed literal enforcement of policy provisions where such enforcement would defeat the reasonable expectations of the insured.

In *Haugen v. Auto-Owners Insurance Co. of Lansing,* 191 N.W.2d 274 (N.D.1971), the doctrine was given more explicit recognition in syllabus ¶ 4, at 275:

"4. An insurance policy is held to mean what a reasonable person in the position of the insured would think it meant."

It appears that in North Dakota the Doctrine of Reasonable Expectations, in principle, has been adopted statutorily as well. Section 9–07–14, NDCC, which apparently has not been identified as an exposition of the doctrine, states:

"If the terms of a promise in any respect are ambiguous or uncertain, it must be interpreted in the sense in which the promisor believed at the time of making it that the promisee understood it."

The invocation of the Doctrine of Reasonable Expectations may not always be appropriate but is when, as here, ambiguity is created by confusingly dissimilar exclusionary language buried in the bodies of two policies ostensibly providing comprehensive farm liability coverage. What the one hand bestows, the other imperceptibly takes away. This kind of legerdemain by draftsmanship, the lack of notice to the buyer of the policy exclusions, the inconspicuous placement of the exclusionary clauses in the contracts, their obscure relationship to each other, and the reasonable belief of the insured that he was securing general liability coverage for his "normal farming operations" all foster coverage expectations which must be fulfilled in this instance.[6]

There were no clearly erroneous findings; the trial court did not err in its conclusions of law; the judgment is affirmed.

VOGEL, J., concurs.

ERICKSTAD, Chief Justice, concurring specially.

The view expressed by Justice PEDERSON seems to be that, as aerial spraying is a common practice among farmers today, when a farmer purchases a liability policy, he should be permitted to reasonably expect that such activity is covered by the policy unless he is informed to the contrary by the insured's agent, notwithstanding that the policy excludes such coverage.

If this is to be the law, then those who sell insurance should be so informed; not by our court, but by the Legislature.

In the instant case, I believe that the trial judge's conclusion as to liability, if not his reasoning, may be sustained on the basis of the ambiguity created by the use of the word recreational in the phrase "of any recreational motor vehicle or aircraft" in the "Top Brass" policy as follows:

"This Part shall not apply with respect to coverage (a):

. . . . .

"(b) to any liability arising out of the ownership, maintenance, operation or use, including loading or unloading, of any recreational motor vehicle or aircraft, except recreational motor vehicle or aircraft for which coverage is provided by an underlying policy listed in Schedule A and then not for broader coverage than is provided by such insurance."

In my view, an ordinary person purchasing a policy with such a provision might reasonably be misled to believe that only recreational activity was excluded from coverage.

I do not believe that the insurance company should benefit from the fact that the insured did not read the policy.

If the terms of the exclusion are ambiguous, they must be read in favor of the insured and against the insurer.

---

6. For a case which discusses obligations arising out of "status" and "reasonable expectation" in quite a different context, see *Marvin v. Marvin,* 134 Cal.Rptr. 815, 557 P.2d 106 (1976).

I agree with that part of Justice PEDERSON's opinion which reads:

". . . it has been well established in North Dakota that any ambiguity or reasonable doubt as to the meaning of a policy is to be construed strictly against the insurer and in favor of the insured, and if language in a policy will support an interpretation which will impose liability on the insurer and one which will not, the former interpretation will be adopted. *Nodak Mutual Insurance Company v. Loeffler*, 225 N.W.2d 290 (N.D.1974); *Conlin v. Dakota Fire Insurance Company*, 126 N.W.2d 421 (N.D.1964). Section 9–07–19, NDCC, provides in part:

"In cases of uncertainty not removed by the preceding rules, the language of a contract should be interpreted most strongly against the party who caused the uncertainty to exist. The promisor is presumed to be such party, . . .'"

SAND and PAULSON, JJ., concur.