CONTINENTAL CASUALTY
COMPANY, Plaintiff
and Appellee,

v.

Robert W. KINSEY, Robert W.
Kinsey, P.C., Defendants,

and

Anita Bjorgen, Defendant and Appellant.

CONTINENTAL CASUALTY
COMPANY, Plaintiff
and Appellee,

v.

Robert W. KINSEY, Robert W. Kinsey,
P.C., Defendants and Appellants,

and

Anita Bjorgen, Defendant.

Civ. Nos. 920252, 920288.

Supreme Court of North Dakota.

April 27, 1993.

Steven A. Storslee (appearance), of Fleck, Mather & Strutz, Bismarck, and Bradley M. Jones (argued), of Meagher & Geer, Minneapolis, MN, for plaintiff and appellee Continental Cas. Co.

James L. Norris, P.C. (argued), Bismarck, for defendants and appellants Robert W. Kinsey and Robert W. Kinsey, P.C.

Winkjer, McKennett, Stenehjem, Reierson & Forsberg, Williston, for defendant and appellant Anita Bjorgen; argued by Kent A. Reierson.

NEUMANN, Justice.

This is a declaratory judgment action brought by an insurance company to determine the extent of its coverage under a professional liability insurance policy. We reverse and remand.

In October 1989, Anita Bjorgen (Bjorgen) obtained a judgment against Robert Kinsey and his professional corporation (Kinsey) for intentional fraud and deceit while providing legal services for her. The jury awarded Bjorgen compensatory damages of $172,000 and exemplary or punitive damages of $100,000. The trial court trebled the compensatory damages award, pursuant to Section 27–13–08, N.D.C.C. The court then struck the jury's $100,000 punitive damages award, because it deemed the treble damages under the statute to be punitive in nature and concluded that it would be an unfair duplication of punitives to also award the $100,000 amount. The trial court entered judgment for $526,964.30, and that judgment was affirmed by this court on appeal, in *Bjorgen v. Kinsey*, 466 N.W.2d 553 (N.D.1991).

During all times relevant to Bjorgen's action, Kinsey had a malpractice insurance policy with Continental Casualty Company (Continental). Continental represented Kinsey in defending against the malpractice action brought by Bjorgen, but it notified Kinsey that it was representing him with a reservation of rights that the insurance policy would not provide coverage for any damages awarded to Bjorgen against Kinsey for fraudulent conduct. Upon conclusion of Bjorgen's malpractice action, Continental filed this declaratory judgment action to determine the extent of Kinsey's insurance coverage with Continental. Kinsey filed a counterclaim alleging, among other issues, that Continental failed to act fairly or in good faith in representing Kinsey in Bjorgen's malpractice action against him. All parties filed motions for summary judgment.

The district court reviewed the insurance policy, concluded that it was unambiguous, and held that Kinsey had no coverage under the policy for any of the damages awarded to Bjorgen against him in the malpractice action. The district court also ruled that, even if the contract were ambiguous, insurance coverage for punitive damages is contrary to the public policy of this state. The court also dismissed Kinsey's counterclaim, ruling that Kinsey had failed to raise genuine issues of material fact. Bjorgen and Kinsey filed separate notices of appeal, and all matters were consolidated before this court for hearing and resolution.

We hold that under Kinsey's malpractice insurance policy Continental is obligated to pay the punitive damages portion of Bjorgen's award, up to the $250,000 policy limits. We also hold that Continental can seek indemnity from Kinsey for the amounts paid to Bjorgen, because Kinsey's liability

to Bjorgen is a result of his intentional acts of fraud and deceit. We further hold that the district court must reconsider Kinsey's counterclaim, in view of Kinsey's insurance coverage with Continental. We reverse the decision and remand for reconsideration of Kinsey's counterclaim and entry of a new judgment in accord with this opinion.

## I. THE INSURANCE CONTRACT

 Bjorgen and Kinsey assert on appeal that the trial court erred in construing the insurance policy. The construction of a written insurance contract, including a determination of whether a contract is clear and unambiguous, is a question of law which is fully reviewable by this court. *State Farm Mut. Auto. Ins. Co. v. LaRoque*, 486 N.W.2d 235 (N.D.1992). *Dawn Enterprises v. Luna*, 399 N.W.2d 303 (N.D.1987). A contract is ambiguous when reasonable arguments can be made in support of contrary positions as to its meaning. *State Farm, supra,* 486 N.W.2d at 238.

Under Kinsey's professional liability policy, Continental agreed:

"I....

"A....

"To pay on behalf of the insured all sums which the insured shall become legally obligated to pay as damages:

"1. arising from the performance of professional services for others in the insured's capacity as a lawyer * * * because of an act or omission of the insured or any other person or firm for whose act or omission the insured is legally responsible...."

The insurance policy contained several exclusions from coverage; the following two are relevant to this case:

"II....

"*This insurance does not apply under Coverage A to:*

"A. any dishonest, fraudulent, criminal or malicious act or omission of the insured or any partner, employee, officer or stockholder of the insured....

* * * * * *

"J. punitive or exemplary damages or any fine, penalty or claim for return of fees."

The policy also contained an endorsement form which provided:

"The Company agrees with the insured that the exclusion referring 'to an award of punitive damages' does not apply to this policy."

The trial court reviewed these provisions and construed the policy as unambiguously excluding coverage for any damages arising from Kinsey's fraudulent conduct. The court concluded that even though the endorsement form waived the policy exclusion for punitive damages, Continental was not obligated to pay the punitive damages portion of Bjorgen's judgment against Kinsey, because the underlying basis for Kinsey's liability in that action was his fraudulent conduct. The court reasoned that the exclusion of fraudulent conduct from coverage relieved Continental of any obligation to pay either the compensatory or punitive damages awarded to Bjorgen.

 Although the trial court's construction of the policy may be a possible interpretation of it, we disagree that the policy is unambiguous. A reasonable alternative interpretation of the policy is that the endorsement expressly waiving the punitive damages exclusion applies here and obligates Continental to pay the punitive damages portion of Bjorgen's judgment against Kinsey, up to the $250,000 policy limits. Because there are at least two interpretations of these policy provisions, the policy is ambiguous. *State Farm, supra.*

The primary goal of contract interpretation is to give effect to the mutual intention of the parties as it existed at the time of contracting. Section 9–07–03, N.D.C.C.; *National Bank v. International Harvester Co.,* 421 N.W.2d 799 (N.D.1988). If possible, the intention of the parties is to be ascertained from the written contract, alone. Section 9–07–04, N.D.C.C.

 As a tool for interpreting insurance policies, this court has expressly adopted the "Doctrine of Contract of Adhesion," whereby ambiguous policies are construed

most strongly against the insurers and in favor of providing insurance coverage. *Mills v. Agrichemical Aviation, Inc.,* 250 N.W.2d 663, 671 (N.D.1977); *Hughes v. State Farm Mut. Auto. Ins. Co.,* 236 N.W.2d 870 (N.D.1975); *see also Heitkamp v. Milbank Mut. Ins. Co.,* 383 N.W.2d 834 (N.D.1986) (when an ambiguity exists, if one interpretation of the policy language will impose liability on the insurer and the other will not, the interpretation favorable to the insured will be adopted). The doctrine was explained in *Aid Ins. Services, Inc. v. Geiger,* 294 N.W.2d 411, 414–415 (N.D.1980):

> "We recognize that when the language of an insurance policy is clear and explicit, the language should not be strained in order to impose liability on the insurer.... However, it is well-established in North Dakota that, because an insurance policy is a contract of adhesion, any ambiguity or reasonable doubt as to the meaning of the policy is to be strictly construed against the insurer and in favor of the insured. If the language in an insurance contract will support an interpretation which will impose liability on the insurer and one which will not, the former interpretation will be adopted.

> \* \* \* \* \* \*

> "Insurance contracts are unipartite in character. They are drafted by company experts learned in the law of insurance. Insurance policies should be written so that an ordinary layperson, untrained in the field of insurance, can clearly understand them and know whether or not coverage is afforded. If they are not so written, the insurance company must assume the consequences of the ambiguity and resulting confusion." (Citations omitted.)

However, we do not apply this doctrine in a vacuum. If parol evidence is offered which clearly indicates that the parties, particularly the insured, did not contemplate insurance coverage under the circumstances, or if application of other relevant rules of contract interpretation clearly shows that the parties did not intend coverage, then the Doctrine of Contract of Adhesion will not be applied to obtain a contrary result.

*Walle Mutual Insurance Co. v. Sweeney,* 419 N.W.2d 176 (N.D.1988), is an example of a case where parol evidence clearly showed that the parties did not intend coverage under the circumstances, even though strict construction of the policy against the insurer would have led to an opposite result. The dispute in *Walle* was whether a farm liability policy provided coverage for the insured's pickup truck. The policy terms "motor vehicle" and "farm implements" were undisputedly ambiguous, and the insured argued that "there is automatic coverage as a matter of law" because the rule of strict construction against insurance companies and in favor of coverage mandated that result. In support of his interpretation, the insured relied upon § 9–07–19, N.D.C.C.:

> "*Uncertainty interpreted against party causing it—Presumption as to cause.* In cases of uncertainty not removed by the preceding rules, the language of a contract should be interpreted most strongly against the party who caused the uncertainty to exist...."

By its express terms, Section 9–07–19, N.D.C.C., is a rule of last resort. In *Walle,* it was unnecessary to apply the rule, because parol evidence resolved the policy ambiguity.

The insured in *Walle* candidly testified that he did not believe at the time of purchasing the policy that it covered his pickup truck. The sales agent testified that he never told the insured that the policy covered pickup trucks and he also testified that he was in the habit of telling applicants that farm liability policies do not cover any licensed motor vehicles. The trial court found that neither party intended the farm liability policy to provide coverage for injury arising from the operation of the insured's pickup truck and further found that the insured had no reasonable expectation that the policy would provide such coverage. This court concluded that those findings were not clearly erroneous and held that there was not coverage under the policy for the insured's pickup truck. We determined that the parol evidence

clearly revealed the mutual intention of the parties, making application of the rule of strict construction under Section 9–07–19, N.D.C.C., unnecessary and inappropriate. It also made it unnecessary to apply the Doctrine of Contract Adhesion, which was not discussed in the case.

■ Section 9–07–19, N.D.C.C., is a general rule for interpreting ambiguous contracts and, unlike the Doctrine of Contract of Adhesion, is not limited in its application to adhesion contracts. Because Section 9–07–19, N.D.C.C., requires an ambiguous contract to be construed against any party who has created the ambiguity, irrespective of that party's bargaining position or level of expertise, the Legislature has seen fit to make it a rule of last resort, applied only when other rules of construction do not resolve the ambiguity. However, both the scope and underlying basis of the Doctrine of Contract of Adhesion are significantly different from the scope and basis of Section 9–07–19, N.D.C.C. That doctrine is applied only to ambiguous "adhesion" contracts, drafted by experts in the subject matter of the contract (e.g. insurance) and offered on a "take it or leave it" basis. *Mills, supra,* 250 N.W.2d at 668. Thus, the Doctrine of Contract of Adhesion, unlike the strict construction rule of Section 9–07–19, N.D.C.C., is not a last resort guideline for contract interpretation. Rather, it is a rule which we apply together with other relevant rules of contract interpretation to resolve ambiguities in adhesion contracts. The ultimate objective does not change—to ascertain and give effect to the mutual intention of the parties.

In this case the parties have not asserted that there is a factual dispute related to the meaning of the ambiguous policy provisions nor have they asserted that there is relevant parol evidence from which we could glean the mutual intent of the parties. We must, therefore, ascertain the parties' intent from the policy itself, using our relevant rules of interpretation.

■ The ambiguity in this policy arises from the seemingly inconsistent dictates of the fraudulent conduct exclusion and the express policy waiver of the punitive damages exclusion. Through the endorsement waiver form, the policy purports to cover punitive damages. However, a finding of oppression, fraud, or malice, actual or presumed, is a prerequisite to an award of punitive damages. Section 32–03–07, N.D.C.C.; *Slaubaugh v. Slaubaugh,* 466 N.W.2d 573 (N.D.1991); *Olson v. Fraase,* 421 N.W.2d 820 (N.D.1988). The exclusion in the policy from insuring "dishonest, fraudulent, criminal or malicious" conduct creates an ambiguity because it is inconsistent with the coverage for punitive damages. If we construe the policy as not covering punitive damages when fraudulent or malicious conduct is involved, then the punitive damages coverage is rendered meaningless. However, we must give effect to every provision in the contract, if possible. Section 9–07–06, N.D.C.C.; *National Bank of Harvey v. International Harvester Co.,* 421 N.W.2d 799 (N.D.1988). In doing so, we apply the rule that Continental, as drafter of the policy, must assume the consequences of any ambiguity in the policy.

■ By attaching the endorsement form waiving the punitive damages exclusion, Continental expressly provided coverage for punitive damages under the policy. To give that provision effect, it must necessarily apply when the malpractice involves fraudulent or malicious conduct. *See Slaubaugh, supra.* But, the endorsement waiver applies only to punitive damages. Therefore, we hold that Kinsey's professional liability policy with Continental affords coverage for the punitive damages portion of Bjorgen's treble damage award against Kinsey, up to the policy limits of $250,000, but excludes coverage for actual or compensatory damages which stem from Kinsey's fraud or other conduct excluded under exclusion I. A.

## II. PUBLIC POLICY

The trial court also concluded that, even if the policy provided coverage to Kinsey for Bjorgen's punitive damages award, "such insurance coverage would be precluded by the public policy of the

State...." Kinsey and Bjorgen argue that public policy does not preclude insurance coverage for punitive damages. Continental asserts that the trial court was correct in concluding that such coverage violates public policy.

The courts are divided on whether liability insurance generally covers punitive damages. *See* Annot., *Liability Insurance Coverage as Extending to Liability for Punitive or Exemplary Damages*, 16 A.L.R.4th 11 (1982). The issue is summarized in Couch on Insurance 2d, (Rev. ed.) § 56:9 at pp. 15–16:

> "There is a substantial split in authority as to whether punitive damages assessed against an insured are recoverable under the terms of a liability policy. The courts concentrate on the language of the insuring agreement and attempt to make such an interpretation with a view toward the nature of punitive damages which is to deter certain types of conduct. The better position is that, absent specific language in the policy extending coverage for punitive damages, no coverage exists for such damages as it is against public policy to allow the insured wrongdoer to shift the burden of payment of punitives to its insurer."

■■■ To determine the public policy of this state we look first to the state constitution and statutes. Although the constitution is silent on this issue, the Legislature has spoken to it, under Section 26.1–32–04, N.D.C.C.:

> "*Willful act exonerates insurer, negligence does not.* An insurer is not liable for a loss caused by the willful act of the insured, but the insurer is not exonerated by the negligence of the insured or of the insured's agents or others."

This law is an express statement of public policy that an insured cannot be indemnified for losses caused by his own willful conduct. *Hins v. Heer*, 259 N.W.2d 38 (N.D.1977). California has an identical provision [West's Annot.Cal.Ins.Code, § 533], and has construed it to preclude payment by an insurance company for punitive damages awarded against its insured for his own willful tort. *City Products Corp. v. Globe Indem. Co.*, 88 Cal.App.3d 31, 151 Cal.Rptr. 494 (1979). We agree with California's interpretation that this statutory language generally exempts insurance carriers from liability for punitive damages or any other losses incurred by an insured because of his intentionally wrongful conduct.

However, the specific question we must resolve in this case is whether Continental is exempted by public policy, under Section 26.1–32–04, N.D.C.C., from complying with its express contractual promise to pay for punitive damages awarded against Kinsey. In deciding this question, we recognize that contracts are to be interpreted to give effect to the mutual intention of the parties if that intent is ascertainable and lawful. Section 9–07–03, N.D.C.C. It is an important function of the courts to "maintain and enforce contracts, unless it clearly appears they contravene public policy or express law." *Seher v. Woodlawn School Dist. No. 26*, 79 N.D. 818, 59 N.W.2d 805, 810 (1953). We are also mindful of the conclusion in Couch on Insurance, *supra*, § 56:9, at p. 16, that the better policy is that punitive damages are not covered by an insurance contract "absent specific language in the policy extending coverage for punitive damages."

■■■ The interpretation of a statute is a question of law, fully reviewable by an appellate court. *Aanenson v. Bastien*, 438 N.W.2d 151 (N.D.1989). The primary purpose of statutory construction is to ascertain the intent of the Legislature. *Flermoen v. North Dakota Workers' Compensation Bureau*, 470 N.W.2d 220 (N.D. 1991). In determining legislative intent, the court may consider the object sought to be obtained, the statute's connection to other related statutes, and the consequences of a particular construction. *Holtz v. North Dakota Workers' Compensation Bureau*, 479 N.W.2d 469 (N.D.1992). We attempt to harmonize related statutory provisions, giving meaningful effect to each provision, while accomplishing the legislative objective. *Fastow v. Burleigh County Water Resource Dist.*, 415 N.W.2d 505 (N.D.1987).

A statute closely related to Section 26.1–32–04, N.D.C.C., in purpose and objective, is Section 9–08–02, N.D.C.C.:

> "*Contracts against the policy of the law.* All contracts which have for their object, directly or indirectly, the exempting of anyone from responsibility for his own fraud or willful injury to the person or property of another, or violation of law, whether willful or negligent, are against the policy of the law."

These two provisions, construed together, quite clearly manifest a public policy of discouraging persons from committing fraud or other willful acts that cause injury to others. These statutes foster that public policy by prohibiting contracts which would exempt a person from being held responsible for the consequences of his wrongful intentional conduct (Section 9–08–02, N.D.C.C.) and by precluding insurers from indemnifying insureds for losses caused by the insured's willful acts (Section 26.1–32–04, N.D.C.C.). However, we do not believe that this legislation was intended to benefit insurance companies by allowing them to collect premiums for coverage they do not intend to provide. Nor do we believe that the Legislature intended to benefit insureds who cause intentional injury to others, by allowing them to shift to insurance carriers the monetary responsibility for their intentional torts.

To give effect to the Legislature's objectives in enacting these laws, we construe and apply them within the factual circumstances of this case, as follows. Continental is obligated, under the express terms of its insurance policy with Kinsey, to pay for the punitive damages awarded to Bjorgen against Kinsey, up to the policy limits. However, Continental may seek indemnity from Kinsey, who is prohibited by these statutes from being either indemnified or exonerated for injury caused by his own fraud or deceit. With this application of our statutes to these facts, Continental is required to meet its contractual obligation to pay for punitive damages awarded against Kinsey, but it has recourse against Kinsey for these payments, because the losses stem from Kinsey's willful fraud and deceit. *See Fastow, supra,* 415 N.W.2d at 510 (full extent of purchased insurance coverage is available to satisfy judgments against a political subdivision even though statutes place limitations on a political subdivision's liability).

## III. KINSEY'S COUNTERCLAIM

Kinsey also asserts on appeal that the trial court erred in dismissing his counterclaim against Continental. Kinsey alleged in the counterclaim that Continental did not represent him fairly or in good faith in defending the action brought by Bjorgen. Kinsey asserted that Continental did not properly conduct discovery, did not negotiate in good faith to settle with Bjorgen, and did not otherwise represent him in good faith. Continental asserts that Kinsey's failure to file a timely appeal from the final judgment in this case precludes consideration of this issue on appeal.

In April 1992, Continental moved for summary judgment in its favor and dismissal of Kinsey's counterclaim. Following a hearing, the trial court granted Continental's motion. A final judgment was entered on July 17, 1992, and notice of entry of final judgment was served on all parties on July 22, 1992.

In a document entitled "Kinsey's Motion For Reconsideration," dated July 15, 1992, and filed on August 3, 1992, Kinsey requested the court to reconsider its order granting summary judgment to Continental and dismissing Kinsey's counterclaim. The trial court treated the motion as a request for relief from the judgment on grounds of newly discovered evidence, under Rule 60(b)(ii), N.D.R.Civ.P. By order, dated July 31, 1992, the court denied Kinsey's motion for reconsideration. On September 29, 1992, Kinsey filed his notice of appeal from the final judgment of July 17, 1992, and from orders of the court dated December 17, 1991, July 1, 1992, and July 31, 1992. Continental asserts that this notice of appeal was untimely.

Under Rule 4, N.D.R.App.P., a notice of appeal must be filed within 60 days from the date of the service of notice of entry of the judgment or order appealed

from. The running of the time for filing a notice of appeal under Rule 4, N.D.R.App. P., is not tolled by the filing of a Rule 60(b), N.D.R.Civ.P., motion, but it is tolled by the filing of a motion to alter or amend the judgment under Rule 59, N.D.R.Civ.P. Under the corresponding federal rule, a motion characterized as "a motion for reconsideration" is deemed to be a Rule 59 motion to alter or amend the judgment, for purposes of tolling the time period for filing a notice of appeal. *Tylo Sauna, S.A. v. Amerec Corp.*, 826 F.2d 7 (Fed.Cir.1987); *Emory v. Secretary of Navy*, 819 F.2d 291 (D.C.Cir.1987); *Rados v. Celotex Corp.*, 809 F.2d 170 (2d Cir.1986); *Federal Kemper Ins. Co. v. Rauscher*, 807 F.2d 345 (3d Cir.1986). Following these federal authorities, we are persuaded that Kinsey's motion should be treated as a Rule 59, N.D.R.Civ.P., motion, for purposes of tolling the time period for filing the notice of appeal. We conclude, therefore, that Kinsey filed a timely notice of appeal and that the issue of whether the trial court erred in dismissing Kinsey's counterclaim is properly before this court.

The primary ground for the trial court's dismissal of Kinsey's counterclaim was the court's conclusion that Kinsey's insurance policy with Continental did not provide coverage for Bjorgen's judgment against Kinsey. We have construed the policy to provide coverage for the punitive damages portion of Bjorgen's judgment, and, therefore, it is necessary for the trial court to reconsider the merits of Kinsey's counterclaim.

█ Because the issues discussed in this opinion are dispositive of the appeal, other issues raised by the parties need not be addressed. *Karst v. Vickers*, 444 N.W.2d 698 (N.D.1989). We reverse the decision of the trial court, and we remand for reconsideration of the issues raised by Kinsey's counterclaim and for entry of judgment in accordance with this opinion.

REVERSED AND REMANDED.

SANDSTROM, Acting C.J., MESCHKE, J., and RALPH J. ERICKSTAD, Surrogate Judge, concur.

RALPH J. ERICKSTAD, Surrogate Judge, sitting in place of VANDE WALLE, C.J., disqualified.

LEVINE, Justice, dissenting.

I dissent for a number of reasons. My primary one is that the insurance contract, if read reasonably, and in its entirety, is not ambiguous.

In disassembling *Walle Mutual Insurance Co. v. Sweeney*, 419 N.W.2d 176 (N.D. 1988), the majority must and does concede that the Legislature, through section 9–07–19, NDCC, says that construing an ambiguous contract against the one who drafted it is a rule of last resort. But, then the majority holds that the "Doctrine of Contract of Adhesion" is not a rule of last resort. *Compare Walle Mutual, supra.* Instead, it is a rule we apply together with other relevant rules of contract interpretation to resolve ambiguities in adhesion contracts. Either, we apply section 9–07–19 last, just as its language tells us to and *Walle Mutual* confirmed, or we apply it first, like the majority does in fact. It is an oxymoron, an illogical assertion, to apply it "along with other rules of construction." The question is not *whether* we apply the statute, but *when*, in the chronology of interpretive events, we apply it. In applying it first, the majority undermines past efforts to rationalize and harmonize the rules of construction contained in our statutes and those contained in our cases. But here, it is beyond me how coverage for punitive damages could have been intended by the parties. After all, the insured is a lawyer whose stock in trade is knowledge of the law or the skill to acquire that knowledge, and the law, specifically, sections 26.1–32–04 and 9–08–02, prohibits insuring for willful injury and the punitive damages arising from that injury.

The majority finds an ambiguity in this policy "from the seemingly inconsistent dictates of the fraudulent conduct exclusion and the express policy waiver of the punitive damages exclusion." However, the majority omits a key part of the exclusion to come up with an ambiguity. If, indeed, the policy were as the majority sets forth, I

would agree it was ambiguous. But, it is not. Section II not only excludes coverage for "dishonest, fraudulent, criminal or malicious acts," it also excepts from the exclusion "any act or omission which is the basis of a malicious prosecution claim." The complete, untruncated text reads:

"This insurance does not apply under Coverage A to:

A. any dishonest, fraudulent, criminal or malicious act or omission of the insured or any partner, employee, officer or stockholder of the insured. *This exclusion does not apply to any such act or omission which is the basis of a malicious prosecution claim; ...*" (Emphasis added.)

So, reading the language which was omitted from the exclusion, along with the language the majority described in the exclusion, there is an exception to the exclusion. The exclusion does not apply to malicious prosecution. We have said that when an exclusion does not apply to a claim because it is excepted, there is coverage for the excepted claim. *Applegren v. Milbank Mutual Ins. Co.*, 268 N.W.2d 114 (N.D. 1978). Consequently, there is coverage for malicious prosecution. And, punitive or exemplary damages are recoverable in a suit for malicious prosecution. *Stoner v. Nash Finch, Inc.*, 446 N.W.2d 747 (N.D.1989); *Merchant v. Pielke*, 10 N.D. 48, 84 N.W. 574 (1900).

Reading the exclusion in its entirety, we can see what the endorsement (that waives the exclusion against punitive damages) applies to. It can only apply to malicious prosecution because malicious prosecution is the only claim for which there is insurance coverage, and the only claim which gives rise to punitive damages. It seems so straightforward to me but I concede that reading any insurance policy is not without challenge.

I would hold that the contract was not ambiguous because of its plain language. In the alternative, it is not ambiguous because, although there may be two or more possible interpretations, only one is reasonable under the circumstances. We define ambiguity by reference to the contingency that there be two reasonable interpretations. I say there is only one reasonable one in this case because the other, that adopted by the majority, renders the contract violative of public policy and, in effect, void. A contract should be construed, if possible, to follow the law and public policy, not to contravene it. *See Seher v. Woodlawn School District No. 26*, 79 N.D. 818, 59 N.W.2d 805 (1953).

Relevant statutes must be read into every insurance contract. *See Montgomery v. Whitbeck*, 12 N.D. 385, 96 N.W. 327 (1903); *see generally* 1 Couch on Insurance 2d § 13.6. Thus, sections 26.1–32–04 and 9–08–02, NDCC, which forbid indemnifying, *i.e.*, insuring against punitive damages, must be read into the policy. A statute controls a contrary policy provision and the conflicting provision in the insurance contract must give way to the statute. *Anderson v. Northwestern Fire & Marine Ins. Co.*, 51 N.D. 917, 201 N.W. 514 (1924). So, the majority's interpretation sets up a remarkable circumstance. Having construed the policy to cover punitive damages, now it must find, because of the plain language of the statutes, that the coverage violates those statutes (and the public policy enunciated by the statutes) that must be read into the policy. As a result, the majority should then strike the offending provisions. While the majority acknowledges that it can't enforce the very policy it first rewrote, it simply rewrites the policy a second time, this time creating an extra-policy remedy—the Company must pay the punitive damages and then collect from Kinsey. In order to pay, the Company must have contracted to pay. It did not. In order to subrogate, the Company and Kinsey must have agreed to subrogate. They did not. Therefore, I believe neither the majority's construction of the contract nor the argument upon which the construction is based, is reasonable. There being only one reasonable construction, there is no ambiguity.

After finding the contract ambiguous and construing it against the insurer to provide coverage for punitive damages, the majority says that because the insurance

contract "expressly" promised to pay punitive damages (the only reason it "expressly" promised to pay is because of the construction given to it by the majority), it may conflict with the public policy enunciated in our statutes and case law that prohibits insuring against punitive damages.

I was skeptical of the analysis when it was introduced by an excerpt from Couch on Insurance 2d that when there is a public policy against covering punitive damages, there should be no coverage for punitive damages, "absent specific language in the policy extending coverage for punitive damages." I was afraid we were going to follow Couch, not our state and case law. Even Couch does not say that courts should first construe the insurance contract in a way that makes it violate public policy, and Couch does not suggest that courts should supply the "specific language in the policy" that extends coverage for punitive damages. Yet, that is what the majority does. First, it creates the ambiguity; second, it construes that ambiguity against the insurer so as to provide coverage for punitive damages; third, it recognizes that covering punitive damages conflicts with public policy; and as the grand finale, the majority fashions a solution for the problems of its own making: it converts a liability insurance policy, that was purchased to and intended to provide indemnity, into a surety bond, not contracted for, and presumably not paid for.

The plain language in the contract, the public policy of our State, clearly expressed in our statutes, the case law cited by the majority as well as *Haser v. Maryland Casualty Co.*, 78 N.D. 893, 53 N.W.2d 508 (1952), preclude the result here. A rose by any other name is still a rose. Payment of punitive damages by Continental is still against public policy.

I respectfully dissent. I would affirm the trial court.