MEVORAH et al. v. GOODMAN et al.

No. 7395.

Supreme Court of North Dakota.

Oct. 16, 1953.

Rehearing Denied Oct. 30, 1953.

582

Burnett, Bergesen, Haakenstad & Conmy, Fargo, for plaintiffs and respondents.

Lanier, Lanier & Knox and Aaron Aronson, Fargo, for defendants and appellants.

MORRIS, Chief Justice.

This is an action to recover damages for conversion of personal property. On June 23, 1950, the plaintiffs, as purchasers, and the defendants, as sellers, entered into a conditional sales contract whereby the plaintiffs purchased a business known and operated as Irving's Tractor Lug Company. Involved in the sale was a stock of new, reconditioned, and used parts for tractors and agricultural implements, as well as catalogs and office supplies. The consideration was $100,000, of which $5,000 was paid in cash. Title to the stock of goods was retained by the defendants until all of the purchase price was paid. The plaintiffs took possession July 1, 1950, and operated the business until February 5, 1951, when the defendants seized possession of the place of business in Fargo, North Dakota, and the supplies, goods, and equipment therein and served notice on the plaintiffs that the agreement of June 23, 1950, was declared breached, the sums paid thereon forfeited for liquidated damages, and the lease provisions for the premises incorporated in the agreement terminated. At the time of seizure the unpaid balance of the purchase price had been reduced to $83,000. On February 17, 1951, a temporary receiver was appointed. This appointment was vacated by the court on March 15, 1951; whereupon the defendants again took possession of the place of business in Fargo and the supplies and stock of goods remaining therein, which included certain goods purchased by the plaintiffs and added to the stock after July 1, 1950, and prior to the time that it was seized by the defendants.

The plaintiffs' complaint originally contained four causes of action. The third was dismissed by stipulation. The litigation now involves three causes of action. The first cause of action seeks damages in the sum of $10,000 for the conversion of

the files and papers, the catalogs, office supplies, stationery, and duplicate part books that were sold outright to the plaintiffs.

In the second cause of action the plaintiffs seek $4,500 as damages for the conversion of new merchandise, consisting principally of tractor parts, which the plaintiffs bought and added to the stock on their own account subsequent to the execution of the conditional sales contract of June 23, 1950.

In the fourth cause of action the plaintiffs allege their purchase and ownership of the stock of goods and its conversion by the defendants on February 5, 1951. They then allege:

"That on the date of the conversion of said property by the defendants, to wit, on February 5, 1951, the value of said property described in this cause of action was One Hundred Forty Thousand Dollars ($140,000.00) and that at said time the plaintiffs still owed to the defendants the sum of Eighty-three Thousand Dollars ($83,000.00) on the purchase price and that the plaintiffs have been damaged by such wrongful and illegal taking of said property in the sum of the difference between Eighty-three Thousand Dollars ($83,000.-00) and One Hundred Forty Thousand Dollars ($140,000.00), to wit, the sum of Fifty-seven Thousand Dollars ($57,000.-00)."

The defendants, by amended answer, deny generally the allegations of the complaint and plead that at the time of seizure the plaintiffs had already breached the terms and conditions of the conditional sales contract. The defendants further allege the entry of a former judgment in a breach of contract action arising out of the same subject matter as that involved in the first and fourth causes of action and that as to those causes of action the former judgment is res judicata and that the plaintiffs are estopped from taking further proceedings thereon.

The jury rendered a verdict in favor of the plaintiffs for separate amounts on the three causes of action submitted and after entry of judgment thereon the defendants moved for a new trial upon the ground, among others, that the damages allowed by the jury are excessive and appear to have been given under the influence of passion and prejudice.

The trial court issued its memorandum decision stating that it would grant a new trial unless within ten days the plaintiffs would file a remission in amounts therein stated. Such remission was filed and the trial court issued the following order:

"And it now appearing to the Court that the plaintiff has consented to the reduction of the verdicts and judgment as directed in the memorandum decision and it further appearing affirmatively to the Court that the passion or prejudice of the jury affected only the amount of damages allowed and did not influence the jury's findings on other issues,

"It is therefore ordered, that the defendants' motion for a new trial is hereby in all things denied, and

"It is further ordered that the verdicts and judgment herein are reduced as follows: the verdict on the first cause of action which was in amount $5,055.00, together with interest at the legal rate from February 5, 1951, is reduced to the sum of $2,480.00, together with interest thereon at the legal rate from and since February 5, 1951; the verdict on the second cause of action which was in amount $4,000.00 with interest thereon at the legal rate from and since the 5th day of February, 1951, is reduced to the sum of $2,200, together with interest thereon at the legal rate from and since the 5th day of February, 1951; and the verdict on the fourth cause of action which was in amount $33,666.00, together with interest thereon at the legal rate from and since the 5th day of February, 1951, is reduced to the sum of $19,700.00, together with interest thereon at the legal rate from and since the 5th day of February, 1951; the costs heretofore taxed and allowed in the sum of $22.60 will stand in such amount; the amount of the judgment

which, together with interest and costs entered on the 19th day of December, 1952, amounted to a total of $45,935.87 should now be in total amount on the basis of the reduction, together with the computation of interest at 4 per cent from February 5, 1951, to this date on the reduced amounts and together with the sum of $22.60 costs now makes a total judgment in the sum of $26,547.50."

This appeal is from both the judgment and the order denying the motion for new trial.

The defendants predicate error upon the admission of evidence of the retail value of the stock of goods repossessed by the defendants on February 5, 1951. This evidence pertained to both the second and fourth causes of action.

The record discloses that the plaintiff Sills was qualified as a witness by showing that he was familiar through the sale of similar goods with the retail sales price of the various items that compose the stock of goods in question. He had prepared a memorandum in the nature of an inventory listing the goods and the prices from which he was able to compute the total retail sales price of the entire stock. From this same memorandum he computed the highest market value between the conversion and the trial. The witness testified there was a market for that type of goods and that he operated a similar business with a small stock. Plaintiffs' counsel then asked:

"Mr. Sills, based on your testimony you have already given us as to this operation of this business and similar businesses by you and your knowledge of list prices and your knowledge of actual sales I will ask you if you have a knowledge of the retail price obtainable on the market for each item of the goods that were taken from you and that were listed by the Goodmans in the inventories here in Court?"

After the witness had answered in the affirmative, he was then asked:

"And on that knowledge of the retail sales price obtainable of each item are you able to give us the total figure of the retail sales price obtainable on the market for the total of both of these goods, the adding up of the individual retail sales price. Do you understand what I mean? A. Yes, sir.

"Q. I am referring to the goods now as listed in the inventory made by the Goodmans. A. Yes, sir."

These questions were all answered over the objection of counsel for the defendants. The court then said:

"Is the question completed? I think it is. The Court will permit this witness as an expert to testify as to what these goods would have brought at retail if sold at retail at the prices that have been referred to as being in existence on or after February 5, 1951 but with the explanation to the jury that that is not the value of the goods at the time of the alleged conversion but is testimony that may be taken into consideration by them in determining the actual value under the instructions of the Court as they will be given to the jury at that time. I will permit it as testimony but not as testimony of the actual value of the goods in a lot as such, but for guidance in determining that question."

The witness then stated:

"The value based upon total retail prices obtainable for these parts would be in my opinion $239,119.17.

"Q. In that answer do you cover all of the goods with the exception of the office supplies and so forth that were taken from your possession? A. All the new and reconditioned items, that's right.

"Q. Do you place that figure at $239,-119.17? A. Yes, sir.

"Q. I am going to ask you if there was a market where you could sell these goods all in one chunk or in substantial lots? A. No, sir."

The inventory referred to in the above testimony included additional stock purchased by Mevorah and Sills not covered by the conditional sales contract. This is the goods covered by the second cause of

action. Its replacement cost was fixed by Sills at about $4,000.

The witness Mevorah testified that the inventories furnished by the Goodmans and filed in court omitted a number of items which plaintiffs claim had been converted by the defendants and which he listed on a paper marked Exhibit 14. Over objection by the defendants he was permitted to testify regarding retail value as follows:

"Now I want to ask you do you have a knowledge of what the highest resale retail price of these goods was between February 5, 1951, and now? * * *

"The Court: Now what?

"Mr. Conmy: The resale retail price.

"The Court: Of what?

"Q. (By Mr. Conmy) Of all of the goods taken from you as listed by the Goodmans plus the items you say were not listed in either inventory and as listed by you in Exhibit 14. * * * A. $239,119.-17."

The plaintiffs next introduced a paper known as Exhibit 15, listing the goods claimed to have been converted and fixing the value as of February 5, 1951, at $189,-502.05, which the witness Mevorah testified was the retail value as of that date. In admitting this exhibit the court stated:

"The objection is overruled and again I think I will say to the jury at this time that this testimony now that is included in these exhibits which gives you the summary or total of the goods, items of merchandise, which it is alleged were converted by the defendants in this case would have sold for if they had all been sold at the retail price is not conclusive in any way or does not represent the real legal value is admitted as testimony on the theory that it may be of some help to you if and when this case is submitted to you when it will become your duty to determine whether the value of the goods that were converted as 'value' will be defined in the instructions of the Court, at that time, on February 5, 1951,. or of the highest market value of the goods following that date and prior to the trial of this action."

Following this statement a juror asked permission to make an inquiry, which was granted by the court, and the following took place:

"The Juror: I didn't understand his explanation, the witness' explanation, about that 14 and 15 where he derives those different sets of figures.

"The Court: Will you repeat your explanation as to why one figure is higher than the other.

"The Witness: The one figure is based on actual sales made by us before we got thrown out.

"Mr. Conmy: That is in Exhibit 15.

"The Court: And may I add to that this question to help you explain it possibly, and that is your opinion as to the value of the property on February 5, 1951?

"The Witness: That's right.

"The Court: And then the addition is the result by the way of your contention under your testimony that properties of this type increased in value after that and the retail price would have been higher and your total in Exhibit 14 is the highest—what the highest resale retail price would have been since February 5, 1951, is that it?

"The Witness: Yes, your Honor."

The witness later testified that the general increase in prices subsequent to the date of conversion was forty per cent.

The witness Mevorah further testified that there was cost or expense involved in selling the type of goods that he claimed were converted and that with his knowledge of the business he could tell the percentage of sales that would be represented by this cost or expense. Then the following took place:

"Q. Well, from your knowledge of the business what would be the percentage of the retail resale price of the cost of doing

business? Selling. A. The expense you mean?

"Q. Yes.

"The Court: Cost. Total cost of a wholesale and retail business such as was conducted * * *.

"Mr. Conmy: A business of this kind.

"The Court: Yes.

"The Witness: Yes, it will be between five and ten per cent.

"Q. (By Mr. Conmy) You say in this type of business it would be between * *. A. I can organize it between five and ten per cent. I had experience in the old country. I have experience in this country.

"Q. Had you organized it down to that low a percentage of expense before it was taken away from you? A. I was in the process of going * * *.

"The Court: I was what? Will you answer that question again?

"The Witness: We was in the process of going to the expense and that way we eliminated all the employees in any payroll which is the big burden.

"Mr. Conmy: He says he had eliminated all the employees on any payroll which is the biggest burden.

"Q. (By Mr. Conmy) In other words are you telling us that you and Sills were doing all the work? A. That's right. Bookkeeping, typing, all the correspondence, banking, taking parts apart, cleaning them, everything.

"Q. It is on that basis that you put the expense of doing business at somewhere between five and ten per cent of total retail sales, is that what you mean? A. That's right."

In accordance with his promise to the jury at the time of the admission of evidence of retail sales value, the court gave the following instruction:

"In this case I permitted the plaintiffs to give expert testimony as to what the sale of such stock at retail at then existing retail prices would amount to. I charge you that such amount is not of itself the basis of market value. I permitted the introduction of such testimony solely for such help, if any, it gives in determining what amount such stock of goods could have been sold for, at any of the times applicable, in bulk or in convenient lots to a willing buyer. It is obvious that between the prices at which goods may be obtained in a market, if one is available, or at which they can be sold for in bulk or in convenient lots, and at which they may be sold at retail, intervene time, expense, and profit, and such unknown features as depreciation, and/or obsolescence of a portion thereof which might render such items unsaleable or require their sale at lower prices than the retail prices existing at the time of conversion. In that same connection and for a like purpose I allowed the introduction of expert opinion evidence as to the cost of selling at retail. Bear in mind that none of such evidence is conclusive upon your findings but should only be considered by you for whatever you deem it worth in your determination of the value of the stock, which value as hereinbefore defined is the price at which the stock could be sold in bulk or in convenient lots by a willing seller to a willing buyer, neither one being compelled to sell or to buy."

We deem it appropriate to here set out in full the measure of damages prescribed by the legislature for the conversion of personalty, which is prescribed by Section 32–0323, N.D.R.C. 1943:

"The detriment caused by the wrongful conversion of personal property is presumed to be:

"1. The value of the property at the time of the conversion, with the interest from that time; or

"2. When the action has been prosecuted with reasonable diligence, the highest market value of the property at any time between the conversion and the verdict, without interest, at the option of the injured party; and

"3. A fair compensation for the time and money properly expended in pursuit of the property."

 Aside from this statutory provision, the general rule is that in an action for conversion of personal property the plaintiff may recover the fair reasonable market value thereof. Lamoreaux v. Randall, 53 N.D. 697, 208 N.W. 104, 44 A.L.R. 1315; 53 Am.Jur., Trover and Conversion, Section 94. According to the testimony of the plaintiff Sills there was no market where the stock of goods could be sold as a whole or in substantial lots. That testimony was undoubtedly elicited for the purpose of laying a foundation for the admission of the testimony as to retail value based upon the plaintiffs' experience in making sales at retail of similar goods. It must be borne in mind that the plaintiffs were not attempting to testify as to the value of the property because they were the owners thereof under the rule that an owner of property may testify without qualification other than the fact of ownership as to its value. In re Heart River Irrigation District, N.D., 49 N.W.2d 217; McGilvra v. Minneapolis, St. P. & S. S. M. R. Co., 35 N.D. 275, 159 N.W. 854; Golly v. Northland Elevator Co., 53 N.D. 564, 207 N.W. 438; George v. Odenthal, 58 N.D. 209, 225 N.W. 323. In this instance the plaintiffs were permitted to testify not as owners but as experts with respect to market value on the basis of their experience as retailers and the testimony given was that of the retail sales value of the goods in question based upon the sale of individual items.

 The only case we have been able to find supporting the admission of testimony of retail value where damages were sought for the conversion of a stock of goods is Wehle v. Butler, 61 N.Y. 245, decided in 1874. But in 1877 the same court said in Wehle v. Haviland, 69 N.Y. 448:

"The retail value or the price at which goods are sold at retail includes the expected and contingent profits, the earning of which involves labor, loss of time and expenses, supposes no damage to or depreciation in the value of the goods, and is dependent upon the contingency of finding purchasers for cash, and not upon credit, within a reasonable time, the sale of the entire stock without the loss by unsaleable remnants, and the closing out of a stock of goods as none ever was, or ever will be closed out, by sales at retail at full prices.

"By the allowance of these unearned and uncertain profits, and also the allowance of interest from the time of the conversion the plaintiff recovers the profits which she had hoped to make in the future, and interest upon the profits, as well as upon her investment. The plaintiff was entitled to compensation and that consisted of the market value of the goods, their cost, or what they would have cost in the market and interest thereon, and nothing more."

The trial court advised the jury that the terms "value" or "market value" was the amount for which the stock could be sold in bulk or in convenient lots by a willing seller to a willing buyer, neither one being compelled to sell or to buy. He thus stated the proper measure for determining the value of a converted stock of goods as expressed in various cases and texts.

In Sutherland on Damages, 4th Edition, Volume 4, Section 1098, page 4178, we find that:

"The retail price of property held for sale is not the standard by which its value is to be determined. Where a quantity of merchandise is sued for, the retail price would be unjust, for the merchant in fixing that price takes into consideration not only the first cost of the goods, but store rent, clerk hire, insurance, and probable amount of bad debts, and adds to all these a percentage of profit. This must be understood of a considerable quantity, not of a single article. The owner must be entitled to recover at such rate as he would have to pay in the nearest market where a like quantity could be bought to replace the property taken; added to this, no doubt, should be the expense necessarily incurred in getting the property so purchased to the place where the trespass was committed."

In Sears v. Lydon, 5 Idaho 358, 49 P. 122, the Supreme Court of Idaho quoted the foregoing passage from Sutherland with approval and held:

"When a stock of merchandise is sued for, the measure of damages is the cost of such stock in like quantity at the place of the alleged trespass, if purchasable there in such quantity; otherwise, the wholesale price of such goods on the nearest markets where they can be purchased in like quantity, with necessary cost of transportation added."

In an action for conversion of goods the Supreme Court of California in an early case (1859) held that the plaintiff could not recover the value of the goods and also the profits which might have been made on their sale. Butler v. Collins, 12 Cal. 457.

The rule stated in Sutherland on Damages is further supported by these authorities: Temple Grocery Co. v. Sullivan, 18 Tex. Civ.App. 281, 44 S.W. 401; Cerny v. Paxton & Gallagher Co., 83 Neb. 88, 119 N.W. 14; Joyce on Damages, Volume 2, Section 1113; Sedgwick on Damages, 9th Edition, Volume 1, Section 248a.

█ It is clear from the foregoing authorities that the trial court adopted the proper measure of damages in this case. The real difficulty arose in connection with the evidence permissible to prove that measure. The court, with reluctance, admitted evidence of retail value as represented by the retail selling price, not as a measure of damages but as evidence which would tend to aid the jury in determining the value of the stock of goods in bulk or in convenient lots. Proof of that value was difficult under the circumstances. The plaintiff Sills testified that there was no market where the goods could be sold in bulk or in substantial lots. Under such circumstances, it does not appear to be unreasonable to permit the introduction of evidence of retail sales value when accompanied by proof of the value of factors other than the bulk value, which are also a part of the retail sales value. The trial court had these factors in mind and enumerated some of them in his cautionary instructions to the jury. Among them were expense, profit, depreciation, and obsolescence, to which should be added the value of the services of the retailer himself in operating the business.

Direct authority upon the point under consideration is difficult to find. That retail value may in some cases be admissible is at least implied by this quotation from Sutherland on Damages, 4th Edition, Volume 2, Section 447, page 1451, wherein the author says:

"The value at which a stock of goods may be sold at retail, *standing alone*, does not afford a basis for fixing their market value, which is what they could have been promptly sold for in bulk or in convenient lots. Between the prices at which goods may be obtained in a market and at which they may be sold at retail in the same place, intervene time, expense and profit, unknown quantities, in the absence of proof." (Emphasis supplied.)

This quotation appears in International Harvester Company of America v. Chicago, Milwaukee & St. Paul Railway Co., 186 Iowa 86, 172 N.W. 471, in which some problems of evidence similar to ours are discussed. In Sedgwick on Damages, 9th Edition, Volume 1, Section 248a, page 501, it is said:

"In one or two cases retail value has been allowed to be shown, not as a basis of recovery, but as evidence. Thus where a retail dealer sued for conversion he was allowed to give evidence of the retail value of the goods, but this was to be reduced by deducting the unearned and uncertain profits." Citing Wehle v. Haviland, 69 N.Y. 448.

The only evidence regarding the factors, other than the replacement cost of the stock described in the second cause of action, that went into the resale retail price was the evidence of the plaintiff Mevorah who testified that the cost of doing business was between five and ten per cent of the retail price. It appears from his testimony that the reason the cost was so low was that he

and his partner eliminated all employees on the payroll and did all the work of conducting the retail business themselves. The value of their work was undoubtedly included in the price for which the goods were sold and was in addition to what the partners regarded as their cost of doing business. To what extent, if at all, these services entered into the bulk value of the stock does not appear. The amount of profit that entered into the retail price is not disclosed. At least with respect to some items, it appears to have been considerable. According to the testimony of Mevorah the markup on new merchandise varied greatly. In percentages he named "25, 60, 70 to 80." Some were sold at more than an 80 per cent markup. The fourth cause of action embracing the stock sold to the plaintiffs under the conditional sales contract consisted of both old and new merchandise. At least a portion of the old merchandise had been reconditioned. Whether the reconditioning was done before or after the purchase from the Goodmans does not appear. Neither does the record disclose the cost of reconditioning or the extent to which it enhanced the value of the stock, either in bulk or at retail. There is nothing in the record from which the jury could determine whether all of the stock consisted of items that were readily saleable or whether some were obsolete or overstocked. The stock was undoubtedly large and consisted of many items. One of plaintiffs' witnesses testified that there were seventy bins in the stock room containing eight to ten thousand piston rings. Exhibits 14 and 15 each list some 4,700 lots of merchandise. Many lots consist of several items. These exhibits show only the price per item and the total retail resale price for each lot. The total value, according to Mevorah's testimony, was $189,502.05, as of February 5, 1951, and $239,119.17 as the highest resale retail value between that date and the time of trial. These exhibits, supplemented by the testimony of both plaintiffs, presented to the jury in visible and impressive form the retail value without further indispensable evidence that would enable them to reduce those retail values to the value of the stock of goods in bulk or in convenient lots, which was the measure of damages which the jury were required to determine. It may be further noted the total values given by the plaintiffs include all the stock claimed to have been converted in a lump sum without distinguishing between the second and fourth causes of action upon which separate amounts were required to be found.

■ The admission of evidence of resale retail value as disclosed by this record unaccompanied by evidence showing the value of factors included in the retail value which would permit the jury to eliminate therefrom that portion which did not represent the value of the stock of goods in bulk or in conveniently saleable lots was error.

■ In their amended answer the defendants set forth

"That the Plaintiffs have, since the filing of the original answer herein, received the verdict of a jury in a breach of contract action arising out of the same subject matter herein, and have entered said judgment; that said judgment is a complete bar to the first, third, and fourth causes of action in said complaint, that said causes of action are res adjudicata and that the plaintiffs are estopped from further proceedings under said first, third, and fourth causes of action."

In support of this allegation the defendants made an offer of proof and asked the court to take judicial notice of the documents set forth in copies of Exhibits A and B, which included the pleadings, instructions, verdict, order for judgment, and judgment. The trial court denied the offer of proof and denied with respect to the first and fourth causes of action all objections to plaintiffs' evidence that were based upon the defense of res judicata. This action on the part of the trial court the defendants specify as error and state in their reply brief:

"As a foundation for this objection as to res judicata, prior to the trial in this case and on March 22, 1952, the defendants duly

moved the Court to dismiss this action upon the grounds that it was res judicata, and the Court entered its order denying said motion on the 4th of December, 1952."

The correctness of the order thus described has never been challenged by the defendants. It was an intermediate order that would have been reviewable upon appeal from the judgment had the defendants specified the entry of the order as error, but no such specification appears in the record.

We have, nevertheless, examined defendants' Exhibits A and B and it is clear to us, as the trial court stated in his memorandum opinion filed herein, that the issues tendered by the complaint in that case and upon which the plaintiffs sought recovery did not involve the same matters that are involved in this case. The pleadings in that case are summarized in Mevorah v. Goodman, N.D., 57 N.W.2d 600. An examination of our opinion clearly discloses that the issues were not such that the defendants were entitled to successfully maintain the defense of res judicata or estoppel in this case.

■ We would further observe that the judgment appealed from in that case has since been reversed and a new trial granted and it can no longer be asserted as res judicata by either party.

"The granting of a motion for a new trial vacates the judgment and the verdict or findings upon which it rested, and neither can any longer be respected as res judicata." Freeman on Judgments, Fifth Edition, Volume 2, Section 720, page 1522.

The defendants specify error in that the evidence is insufficient to justify the verdict as to each cause of action. These specifications of insufficiency pertain only to the amount of the verdict with respect to each cause of action and thus go only to the amount of damages. The defendants do not specify that the evidence is insufficient to warrant the jury in determining that the defendants were guilty of converting the goods described in each cause of action.

■ The plaintiffs sought damages in their first cause of action for the conversion of the records, files, papers, catalogs, office supplies, stationery, and duplicate part books of the Irving's Tractor Lug Company, all of which were purchased outright by the plaintiffs from the defendants in the contract of June 23, 1950. Title was not reserved in the defendants. The jury awarded a verdict of $5,055 with interest from February 5, 1951, which the trial court reduced to $2,480 with interest. Written consent to this reduction was filed by the plaintiffs in accordance with the trial court's order. We find no specified prejudicial error of law with respect to the rendition of the verdict upon the first cause of action. The trial court felt that the jury in rendering the verdict were affected by passion and prejudice which went only to the amount. Our review of the evidence leads us to the conclusion that the trial court's determination was fully justified. A judgment in favor of the plaintiffs as determined by the court in the amount of $2,480, with interest from February 5, 1951, upon plaintiffs' first cause of action is supported by the evidence.

■ A survey of the evidence with respect to the verdicts upon the second and fourth causes of action discloses that plaintiffs' evidence as to value consisted chiefly of testimony as to the resale retail value of the stock of goods. This evidence was erroneously admitted and was clearly prejudicial. It resulted in verdicts on these two causes of action in amounts which the trial court found indicated passion and prejudice affecting the amounts. The court drastically reduced these amounts, but under the circumstances we cannot say that this reduction did or could cure the error in the admission of evidence.

The remission filed by the plaintiffs included a reduction of the verdict with respect to each of the causes of action resulting in the total verdict and judgment. The plaintiffs were not given the opportunity nor were they required to elect as to each remission severally. A new trial must be granted as to the second and fourth causes

of action. Under the circumstances the plaintiffs may not wish their remission to stand as to the first cause of action. Justice requires that they be permitted to elect between a new trial or a judgment for the reduced amount.

With respect to the first cause of action the plaintiffs may elect by a written election filed with the clerk of the district court within ten days of the filing in that court of our remittitur, electing to have judgment entered in favor of the plaintiffs and against the defendants on the first cause of action in the sum of $2,480, with interest thereon from February 5, 1951, at the rate of four per cent. A new trial is granted on the second and fourth causes of action, and upon the first cause of action in event the plaintiffs fail to file an election to have judgment entered thereon, as above provided. The case is remanded to the district court for further proceedings conformable herewith.

GRIMSON, CHRISTIANSON, BURKE and SATHRE, JJ., concur.