**NATIONAL BANK OF HARVEY,**
Harvey, North Dakota, Plaintiff,
Appellee and Cross-Appellant,

v.

**INTERNATIONAL HARVESTER COM-**
**PANY** and International Harvester
Credit Corporation, Defendants, Appel-
lants and Cross-Appellees.

Civ. No. 870092.

Supreme Court of North Dakota.

March 16, 1988.

Zuger & Bucklin, Bismarck, for plaintiff, appellee and cross-appellant; argued by Daniel S. Kuntz.

Vogel, Brantner, Kelly, Knutson, Weir & Bye, Ltd., Fargo, for defendants, appellants and cross-appellees; argued by Jon R. Brakke.

MESCHKE, Justice.

International Harvester Company [IH] and International Harvester Credit Corporation [IHCC] appealed from a decision that the National Bank of Harvey held a superior security interest in the paid-for parts inventory of Bentz Implement Company, that IH and IHCC converted the Bank's property when they repossessed that parts inventory, and that the Bank was entitled to $204,689.11 in damages for the conversion. The Bank cross-appealed, seeking prejudgment interest on the award of damages. We remand to modify calculation of damages and to award prejudgment interest, and we otherwise affirm.

Bentz Implement Company, a sole proprietorship owned by Gordon Bentz, was an International Harvester dealer at Harvey, North Dakota. Bentz Implement used "floor-plan" financing from IHCC for its wholegoods inventory, but purchased its parts inventory from IH on a "30–days cash" basis. Both IH and IHCC held perfected security interests in Bentz Implement's inventory, accounts receivable, and proceeds.

On May 8, 1976, the Bank loaned Bentz $68,000 to purchase additional inventory, and the Bank took a security interest in Bentz Implement's inventory, accounts receivable, and proceeds, which was then clearly subordinate to the perfected security interests of IH and IHCC.

In the fall of 1976 Gordon Bentz and his son, Bruce, went to the Bank for additional financing. They contemplated that Bruce would acquire an interest in the business, by either incorporation or transfer of the dealership. The Bentzes sought a loan of $300,000, including $150,000 to pay on the "floor-plan" obligation to IHCC. One of the Bank's conditions for the loan was that IH and IHCC subordinate their first priority in Bentz Implement's paid-for parts inventory.

Gordon and Bruce Bentz then met with officials of IH and IHCC to seek approval of a transfer of the dealership to Bruce. They informed IH and IHCC about conditions for the Bank loan, including the requirement that IH and IHCC subordinate their interest in the paid-for parts inventory. IH and IHCC were also made aware that if transfer of the dealership to Bruce Bentz was rejected, Gordon Bentz nevertheless intended to proceed with the refinancing plan.

On October 29, 1976, IH wrote Bentzes that it would not approve transfer of the dealership to Bruce. The letter referenced an enclosed subordination agreement,

signed by representatives of IH and IHCC, which Bruce forwarded to the Bank. The agreement was signed by a Bank officer and returned to Bruce Bentz, who returned it to IH and IHCC to add omitted signatures of witnesses. The Bank, believing that the subordination agreement gave the Bank priority in the paid-for parts inventory of Bentz Implement, then loaned $300,000 to Gordon Bentz. $150,000 of the loan proceeds was paid to IH and IHCC on Bentz Implement's obligations. Bentz Implement thereafter periodically gave the Bank statements showing the value of the parts inventory.

Bentz Implement was closed in October 1983, and IH and IHCC repossessed the inventory. While IH and IHCC representatives were packaging the parts for return to IH, Bank officials informed them that the Bank claimed a superior interest in the parts. After discussion, the parties agreed that IH and IHCC could remove the parts, subject to later resolution of the priorities of their respective claims.

Both sides also claimed security interests in a used 1480 IH combine. The combine had been taken on trade by Bentz Implement and IHCC acquired a security interest in the combine through its floor-plan agreement. Thereafter, this combine was sold to Tim Seibel, although Bentz Implement failed to remit the proceeds to IHCC. Later, the combine was placed back on the lot when Bentz Implement agreed to sell it for Tim Seibel or to buy it back from him. Bentz Implement was unable to sell the combine, and, lacking funds, failed to purchase it. Finally, the combine was sold by Tim Seibel to the son of Gordon Bentz, Paul Bentz, and to Paul's wife, Londa. The purchase money was loaned by the Bank which perfected a security interest in the combine. The Bank later repossessed it.

The Bank sued IH and IHCC for conversion of the parts and to establish the priority of its security interest in the combine. The trial court ruled that IH and IHCC had wrongfully converted the stock of paid-for parts and that they had no interest in the combine. The trial court awarded the Bank damages of $204,689.11, but without prejudgment interest. IH and IHCC appealed, and the Bank cross-appealed, raising these issues:

1) Was the subordination agreement ambiguous?
2) Did the trial court properly interpret the subordination agreement?
3) Did the trial court apply the correct measure of damages?
4) Did IH and IHCC have a security interest in the combine?
5) Was the Bank entitled to prejudgment interest?

I.

IH and IHCC assert that the subordination agreement was not ambiguous and, therefore, the trial court should not have allowed extrinsic evidence about the intent of the parties.

Whether a contract is ambiguous is a question of law. *Graber v. Engstrom*, 384 N.W.2d 307, 309 (N.D.1986). A contract is ambiguous when rational arguments can be made for different positions about its meaning. *Johnson v. Arithson*, 417 N.W.2d 373, 375 (N.D.1987). On appeal, this court will independently review the contract to determine whether it is ambiguous. *Vanderhoof v. Gravel Products, Inc.*, 404 N.W.2d 485, 491 (N.D.1987).

This subordination agreement provided:

"1. IH and IHCC hereby subordinate their security interests to the security interests of the Bank with respect to all inventory now or in the future held for resale by (Dealer) other than new inventory manufactured or sold by International Harvester Company and the proceeds thereof. IH and IHCC further subordinate their security interests to the security interests of the Bank *and* in the proceeds of the sale, in the ordinary course of retail trade, of any specific item of such new inventory manufactured or sold by International Harvester Company for which IH or IHCC have been paid in full by (Dealer), provided any specific item of equipment constituting proceeds is not being financed or to

be financed by IHCC under IHCC's trade-in floor plan terms.

"2. The Bank hereby subordinates its security interest to any interests of IH and IHCC in all new inventory manufactured or sold by International Harvester Company now or hereafter held for resale by (Dealer). Further, the Bank subordinates its security interests to the interests of IH and IHCC in the proceeds of the sale of any item of such new inventory for which IH or IHCC have not been paid in full by (Dealer) or any item of equipment constituting proceeds which is being financed or to be financed by IHCC under IHCC's trade-in floor plan terms." (Emphasis added).

The Bank's position is that, by the second sentence of Paragraph 1, IH and IHCC subordinated their security interests in inventory manufactured or sold by IH for which IH and IHCC had been paid in full, as well as in its proceeds. The first sentence of Paragraph 2, however, seems to give IH and IHCC a superior interest in all new inventory manufactured or sold by IH, whether paid or unpaid.

IH and IHCC argue that the second sentence of Paragraph 1 applies only to the *proceeds* of sale of new inventory for which IH and IHCC had been paid. Based upon testimony of a Bank officer that the Bank would have believed it had a superior interest even if the word "and" was not in the second sentence of Paragraph 1, IH and IHCC make an argument that the word "and" can be read out of the agreement. But, the testimony of how someone would interpret an agreement if its language were different is of little aid in construing it as written.

IH and IHCC also argue that because Paragraph 2 of the agreement clearly gives them priority as to all new inventory that provision should control. IH and IHCC therefore contend that the word "and" should be read out of the contract and Paragraph 1 should be construed to apply only to proceeds.

■ Section 9–07–06, N.D.C.C., requires that a contract be interpreted as a whole:

"The whole of a contract is to be taken together so as to give effect to every part if reasonably practicable. Each clause is to help interpret the others."

The intention of the parties to a contract must be gathered from the entire instrument, not from isolated clauses, and every clause, sentence, and provision should be given effect consistent with the main purpose of the contract. *Vanderhoof v. Gravel Products, Inc., supra,* 404 N.W.2d at 491. IH and IHCC's contention that Paragraph 2 unambiguously gives them priority in new inventory ignores the conflicting provision in the agreement. *See Bismarck Realty Co. v. Folden,* 354 N.W.2d 636, 640 (N.D.1984).

■ We conclude that rational arguments can be made for different interpretations of the subordination agreement. Therefore the trial court properly concluded that it was ambiguous.

## II.

IH and IHCC assert that the trial court erred when it interpreted the subordination agreement to give priority to the Bank's security interest in Bentz Implement's paid-for parts inventory.

IH and IHCC argue that, even if the agreement is ambiguous, the court must first look to the language of the contract in an attempt to reconcile conflicting provisions and determine the intent of the parties. IH and IHCC apparently misunderstand the significance of the determination that a contract is ambiguous. By definition, if a contract is ambiguous, its language supports different reasonable interpretations which cannot be reconciled by looking to the written document alone. If the parties' intent can be ascertained from the writing alone, it is not ambiguous. *See Stracka v. Peterson,* 377 N.W.2d 580, 582 (N.D.1985); § 9–07–04, N.D.C.C. If the intent cannot be determined from the writing alone, *i.e.* when there are different reasonable interpretations of the contract language, other evidence can be considered to clarify the parties' intent. *Thompson v. Thompson,* 391 N.W.2d 608, 610 (N.D.

1986). As noted in *Bohn v. Johnson,* 371 N.W.2d 781, 788 (N.D.1985):

"Thus, a determination that a written agreement is ambiguous and the parties' intentions cannot be determined from the writing alone does not end the inquiry as to the meaning of the agreement. A determination of ambiguity is but the starting point in the search for the parties' ambiguously expressed intentions, which are questions of fact to be determined with the aid of extrinsic evidence."

 The primary goal of a court when interpreting a contract is to ascertain the mutual intentions of the contracting parties. *Lambott v. United Tribes Educational Technical Center,* 361 N.W.2d 590, 593 (N.D.1985); § 9–07–03, N.D.C.C. A contract may be explained by reference to the circumstances under which it was made. § 9–07–12, N.D.C.C. In addition, the parties' conduct in the course of performance after the contract's formation can help determine the meaning of ambiguous language. *Graber v. Engstrom, supra,* 384 N.W.2d at 309. *See also* § 41–02–15, N.D.C.C. [U.C.C. § 2–208]. Of particular assistance in addressing the ambiguity in this agreement is Section 9–07–14, N.D.C.C.:

"If the terms of a promise in any respect are ambiguous or uncertain, it must be interpreted in the sense in which the promisor believed at the time of making it that the promisee understood it."

The trial court allowed extrinsic evidence of the circumstances which culminated in the completion of the subordination agreement. Because the parties never dealt directly with one another, much of this evidence consisted of Bruce Bentz's recollection of the discussion of the Bank's refinancing requirements at the 1976 meeting between IH and IHCC representatives and the Bentzes. After hearing the testimony of the witnesses and reviewing the documentary evidence, the trial court determined:

"25. In view of the Bank's requirement for a priority security position in the paid parts inventory of Bentz Implement to finance the business, and the communication of that requirement to IHC and IHCC who, without disagreement, sent a proposed agreement which the Bank understood to comply with its requirement, the parties intended by the subordination agreement for IHC and IHCC to subordinate their security interests to the security interest of the Bank in the paid parts inventory of Bentz Implement Company.

"26. At the time the subordination agreement was made, IHC and IHCC knew or had reason to know, that the Bank understood that IHC and IHCC were subordinating their security interests to the security interest of the Bank in the paid parts inventory of Bentz Implement."

IH and IHCC contend that these findings are clearly erroneous.

 An ambiguity resolved by use of extrinsic evidence is a question of fact for the trier of fact to decide. *Johnson v. Arithson, supra,* 417 N.W.2d at 375. A conclusion of law is fully reviewable on appeal but a finding of fact is not set aside unless clearly erroneous. Rule 52(a), N.D. R.Civ.P. A finding of fact is clearly erroneous when, although there may be some evidence to support it, the reviewing court on the entire evidence is left with a definite and firm conviction that a mistake was made. *Graber v. Engstrom, supra,* 384 N.W.2d at 309.

 The record amply supports the trial court's findings. Bruce Bentz testified that IH and IHCC were fully informed of the Bank's conditions for refinancing. IH and IHCC's own witnesses testified that there were documents in IHCC's files that evidenced the Bank's request for subordination of IH and IHCC's priority in the paid-for parts inventory. Shortly after being informed of the Bank's request, IH and IHCC sent a signed subordination agreement which the Bank reasonably understood to grant the requested priority in the paid-for parts inventory. IH and IHCC never indicated to the Bank that this subordination agreement was anything other than what the Bank had requested. Section 9–07–14, N.D.C.C., requires that the

court interpret the "promise ... in the sense in which the promisor believed at the time of making it that the promisee understood it." The trial court found that IH and IHCC knew that the Bank would interpret the agreement to give it priority in the paid-for parts inventory. This finding is not clearly erroneous.

IH and IHCC allege that it was never their intention to grant the Bank priority in the paid-for parts inventory, and that as a matter of corporate policy they *never* in any case would subordinate their security interest in a dealer's parts inventory. IH and IHCC, however, did not communicate this intent to the Bank. It is the outward manifestations of assent which govern, not the secret intentions of the parties. *Matter of Estate of Raketti*, 340 N.W.2d 894, 900 (N.D.1983). IH and IHCC were asked to subordinate their security interests in the paid-for parts inventory. They responded by sending a signed subordination agreement which could reasonably be interpreted to comply with the Bank's request, and without any communication that it was not intended to accomplish that purpose. The outward manifestations of IH and IHCC's intent indicated their assent to subordination of their security interests in the paid-for parts inventory.

We conclude that the trial court's findings of fact about the intent of the parties are not clearly erroneous.

### III.

The trial court awarded the Bank the wholesale value of the parts as damages for the conversion. IH and IHCC argue this was error. They further assert that, even if wholesale value is the proper measure of damages, the amount awarded by the court was not correct.

Section 32–03–20, N.D.C.C., states the general measure of damages in tort actions:

"For the breach of an obligation not arising from contract, the measure of damages, except when otherwise expressly provided by law, is the amount which will compensate for all the detriment proxi-

mately caused thereby, whether it could have been anticipated or not."

For conversion of goods, that general provision is refined by Section 32–03–23, N.D.C.C., which creates a presumption that the detriment caused by the conversion equals the value of the property:

"The detriment caused by the wrongful conversion of personal property is presumed to be:

"1. The value of the property at the time of the conversion, with the interest from that time; or

"2. When the action has been prosecuted with reasonable diligence, the highest market value of the property at any time between the conversion and the verdict, without interest, at the option of the injured party; and

"3. A fair compensation for the time and money properly expended in pursuit of the property."

We discussed the application of Section 32–03–23 to a conversion of a stock of goods in *Mevorah v. Goodman*, 60 N.W.2d 581 (N.D.1953). In *Mevorah*, this court concluded that the appropriate measure of damages for conversion of a stock of goods is the wholesale price plus freight costs:

" 'The owner must be entitled to recover at such rate as he would have to pay in the nearest market where a like quantity could be bought to replace the property taken; added to this, no doubt, should be the expense necessarily incurred in getting the property so purchased to the place where the trespass was committed.' " *Mevorah v. Goodman, supra*, 60 N.W.2d at 587 (quoting from 4 Sutherland, Damages § 1098, at 4178–4179 (4th ed. 1916)).

This was the measure of damages employed by the trial court in this case.

IH and IHCC, relying upon *Lovejoy v. Merchants' State Bank*, 5 N.D. 623, 67 N.W. 956, (1896), and *Kelly v. Baird*, 64 N.D. 346, 252 N.W. 70 (1934), assert that the Bank should not be allowed to recover the wholesale value of the parts because it held only a limited interest in the stock of parts. Those decisions, however, do not support that assertion.

In *Lovejoy v. Merchants' State Bank, supra,* property was converted by a first mortgagee. A second mortgagee then sued the first mortgagee for conversion. The court concluded that, because the value of the property was less than the first mortgage, the second mortgagee suffered no detriment from the first mortgagee's conversion. *Lovejoy v. Merchants' State Bank, supra,* 5 N.D. at 626–627, 67 N.W. at 957. Here, however, the Bank's security interest had priority over IH and IHCC's security interests. Thus this is not a case where a superior lienor has converted the property.

In *Kelly v. Baird, supra,* a judgment creditor levied upon his debtor's automobile, knowing that Kelly held a lien upon it. The value of the automobile at the time of conversion was $490, but Kelly's lien was for $380. The trial court awarded Kelly $490. This court reversed, holding that Kelly could not recover more than the unpaid balance of his lien. *Kelly v. Baird, supra,* 64 N.D. at 360–361, 252 N.W. at 76. Here, however, it is undisputed that the value of the paid-for parts inventory is less than the amount due the Bank from Bentz Implement.

We conclude that the trial court applied the correct measure of damages following Section 32–03–23, N.D.C.C., and *Mevorah v. Goodman, supra.*

IH and IHCC also assert that the amount of damages awarded was not the wholesale value. The trial court awarded damages of $204,689.11. Of this amount, $13,152.11 was sale proceeds received by IH and IHCC for parts not eligible for "repurchase" under the dealership agreement. The rest of the damages awarded, $191,537.00, was based upon the "repurchase" price credited to Bentz Implement.

Pursuant to the terms of its dealership agreement, IH and IHCC credited Bentz Implement the current cost to dealers of each part returned, plus a five percent handling charge. In other words, this "repurchase" credit was the current wholesale price of the parts to IH dealers plus five percent. The trial court found that this "repurchase" price was the wholesale value with a five percent allowance for freight.

We agree with the trial court that the current price paid by IH dealers was relevant evidence of wholesale value. More troublesome, however, is the trial court's inclusion of the five percent handling charge. The dealership agreement clearly provided that the five percent was for packaging the parts for return, not for freight expenses:

"The price to be credited or paid will be the price to dealers current at the time the repurchased parts are received by the Company, less policy discounts applicable at that time, whether or not previously allowed to the Dealer, plus 5% of the price to dealers for packing and preparation for return to the destination designated by the Company. The Company will specify method of shipment and will be responsible for transportation costs."

No other evidence suggested that freight expenses would equal five percent of the wholesale price. Although the Bank was entitled under *Mevorah v. Goodman, supra,* to recover freight expenses, it failed to present evidence about those freight expenses.

■ Therefore, we conclude that the trial court erred in including the five percent handling charge in damages for those parts "repurchased" under the dealership agreement. We remand to the trial court with directions to modify the damage award to correct that error, and, otherwise, we affirm the award of damages to the Bank.

## IV.

■ IH and IHCC contend that they held a superior security interest in the 1480 IH combine. It is undisputed that Tim Seibel purchased the combine in the ordinary course of business. He therefore took the combine free from IH and IHCC's security interests. Section 41–09–28(1), N.D.C.C. [U.C.C. § 9–307]. The combine was subsequently sold to Paul and Londa Bentz with funds loaned by the Bank, and the Bank took a security interest in the combine. Bentz Implement had no owner-

ship in the combine when it was subsequently repossessed from Paul and Londa Bentz. It was therefore not "inventory" subject to IH and IHCC's security interests. The trial court did not err when it concluded that IH and IHCC held no security interest in the combine.

### V.

■ On its cross-appeal, the Bank seeks prejudgment interest from the date of the conversion. We agree that the Bank is entitled to interest.

Section 32–03–23, N.D.C.C., recognizes alternatives for one whose personal property is converted: (1) recovery of the value of the property with interest from the time of its conversion, or (2) recovery of the highest market value of the property at any time between the conversion and the verdict, but without interest. This statute plainly gives the injured party the benefit of any substantial appreciation in value after the conversion and before the verdict. But, it is the injured party that has the option of electing between those alternatives.

Although the trial court concluded that the Bank elected the second alternative, we find no support for this conclusion. In its complaint, the Bank alleged that "the Defendants ... are indebted to the Plaintiff for the value of the inventory and interest thereon from the date of the conversion of such inventory." The Bank did not present evidence about any increase in the value of the parts after the conversion; rather, its evidence dealt with the value of the parts on the date of conversion. IH and IHCC have not identified any election by the Bank to use the second alternative measure of damages. Therefore, we conclude that the trial court erred in refusing to award prejudgment interest from the date of conversion.

We remand to the trial court to modify the damage award and to award prejudgment interest as directed. In all other respects the judgment of the district court is affirmed.

ERICKSTAD, C.J., GIERKE, J., ILVEDSON, Surrogate Justice, and SCHMALENBERGER, District Judge, concur.

ILVEDSON, Surrogate Justice, and SCHMALENBERGER, District Judge, sitting in place of VANDE WALLE, J., and LEVINE, J., disqualified.