**Rebecca THOMPSON, Jonathan Mark Thompson, and Meghann Marie Thompson, Plaintiffs and Appellants,**

v.

**NODAK MUTUAL INSURANCE COMPANY, Defendant and Appellee.**

**Civ. No. 900328.**

Supreme Court of North Dakota.

Feb. 21, 1991.

Dosland, Dosland, Nordhougen, Lillehaug & Johnson, Moorhead, Minn., for plaintiffs and appellants; appearance by J.P. Dosland.

Hvass, Weisman & King, Minneapolis, Minn., for plaintiffs and appellants; argued by Charles T. Hvass.

Gunhus, Grinnell, Klinger, Swenson & Guy, Moorhead, Minn., for defendant and appellee; argued by Cheryl L. Anderson.

ERICKSTAD, Chief Justice.

On June 11, 1986, Mark Thompson died as the result of injuries arising from a vehicle accident. His children and wife (Thompsons) initiated an action, in part, to recover underinsured motorist benefits under a policy which had been purchased by him from Nodak Mutual Insurance (Nodak). Both parties filed motions seeking summary judgment. Thompsons appeal from a judgment dated July 13, 1990, issued by the District Court for the East Central Judicial District, which granted Nodak's motion for summary judgment dismissal of Thompsons' complaint, and denied the Thompsons' motion for summary judgment. We affirm.

The decedent died as the result of injuries he sustained in a two-vehicle accident. At the time of his death, the decedent was covered by three separate insurance policies which were issued by Nodak. Froelich Feeds, the employer of the driver of the second vehicle involved in the accident, paid the sum of $500,000, through its insurer, Fireman's Fund Insurance Company, to the plaintiffs prior to the initiation of this ac-

tion. The Thompsons' claims for damages exceed the $500,000 recovered from the third-party tort-feasor.

We are presented with the question of whether or not Thompsons are entitled to recover underinsured motorist benefits under a policy issued by Nodak to the decedent. Essentially, the Thompsons argue that underinsured motorist benefits under the policy are available whenever the damages incurred exceed the amount of insurance carried by the tort-feasor, while Nodak argues that underinsurance benefits only apply when the amount of insurance carried by the tort-feasor is less than the applicable limit of underinsurance coverage.

In 1987, the legislature enacted compulsory underinsurance coverage which included a provision which defines an underinsured motor vehicle as "one for which the applicable limit of liability insurance is less than the applicable limit of underinsurance coverage." *Davis v. Auto–Owners Insurance Co.*, 420 N.W.2d 347, 349 (N.D.1988); N.D.C.C. § 26.1–40–15.3 (1989). However, because the decedent's untimely death occurred prior to the enactment of the 1987 legislation, that legislation does not apply to this case as there is no indication that the 1987 statute should apply retroactively. Section 1–02–10, N.D.C.C. *See e.g.,* *State v. Dimmler*, 456 N.W.2d 297, 298 (N.D. 1990); *Reiling v. Bhattacharyya*, 276 N.W.2d 237, 238 (N.D.1979).

The Thompsons begin their argument by quoting the following language of the underinsurance provisions of Part V of the policy:

"COVERAGE 1–2—Under-insured Motor Vehicle

"We will pay damages for bodily injury:
1. caused by accident; and
2. arising out of the maintenance or use of an under-insured motor vehicle.

"These must be damages an insured:
1. has not been compensated for; and
2. is legally entitled to recover from the owner or driver of an under-insured motor vehicle.

"THERE IS NO COVERAGE UNTIL THE LIMITS OF LIABILITY OF ALL BODILY INJURY LIABILITY BONDS AND POLICIES THAT APPLY HAVE BEEN USED UP BY PAYMENTS OF JUDGMENTS OR SETTLEMENTS." [See pages 38 & 39 of the policy.]

The language in capital letters indicates that no underinsurance coverage exists until the damages at least exceed the third-party tort-feasor's liability coverage.

The Thompsons proceed with their argument by further quoting the policy again under Part V as follows:

"COVERAGE 1–2
1. The amount of coverage is shown on the front of the Declarations under '1–2—Each Person Each Accident.'
   Under 'Each Person' is the amount of coverage for all damages due to bodily injury to one person."

We believe that the remainder of part 1 as well as parts 2 and 3 of COVERAGE 1–2 are also relevant to determination of this appeal and read as follows:

"1. ...
   Under 'Each Accident' is the total amount of coverage for all damages due to bodily injury to two or more persons in the same accident.
2. Any amount payable under this coverage shall be reduced by any amount paid or payable to or for the insured:
   a. under any workers' compensation, disability benefits or similar law; or
   b. by or for any person or organization who is or who may be held legally liable for the bodily injury to the insured; or
   c. for bodily injury under the liability coverage.
3. Any payment made to a person under this coverage shall reduce any amount payable to that person under the bodily injury liability coverage." [See pages 42 and 43 of the Policy.]

The Thompsons interpret the first paragraph under part 1 of COVERAGE 1–2 on page 42 of the policy to mean that the amount of coverage is $100,000; irrespective of what they may have collected from the third-party tort-feasor's liability coverage, or under the workers' compensation

disability benefits or similar law. They then proceed to interpret paragraph 2 under part 1 of COVERAGE 1–2 to be a procedural step for calculating the amount of damages, focusing on the phrase "all damages due to bodily injury." They also contend that "any amount payable" under part 2 must refer to "any damages payable." We do not agree. The first paragraph of part 1 of COVERAGE 1–2 on page 42 tells the reader where to find the amount of coverage for either "Each Person" or "Each Accident." The second paragraph of part 1 then defines "Each Person" coverage, and the third paragraph of part 1 then defines "Each Accident" coverage. These three paragraphs aid the policyholder in reading the provisions on the front of the Declarations page attached to the policy.

In our view, "any amount payable under this coverage", under part 2, relates to the reference to "1–2 Underinsured Motorist $100,000 EACH PERSON/$300,000 EACH OCCUR." which is shown on the front of the Declarations page. If we take that amount, i.e., $100,000 and reduce it by items listed in paragraphs a., b., and c. of part 2, we arrive at negative $400,000 in this case, as the Thompsons have already been paid $500,000 by the third-party tort-feasor's insurance carrier.

The Thompsons argue that, if "amount payable" is construed to mean the limit of the policy, perverse results would occur as indicated in the following example: A policy is sold by Nodak for $100,000 coverage; an accident occurs causing $50,000 of bodily injury; the tort-feasor has $25,000 of liability insurance. The Thompsons contend that if you follow the district court's interpretation Nodak would be required to pay $75,000 in this example, an amount which is greater than the actual injury. However, the Thompsons fail to consider the following language, which they quoted earlier in their argument, which defines damages and requires that the damages must be damages an insured "is legally entitled to recover from an owner or driver of an under-insured motor vehicle." This provision clearly prevents compensation above the amount of bodily injury. In the above example, the injured party is "legally entitled to recover" only the additional $25,000.

We have previously recognized that insurance contracts are to be interpreted according to the rules of construction in Chapter 9–07 of the North Dakota Century Code. *Walle Mutual Insurance Co. v. Sweeney,* 419 N.W.2d 176, 178 (N.D.1988). Section 9–07–06 of the North Dakota Century Code requires the contract to be interpreted as a whole. The Thompsons appear to have selected individual words or partial phrases in order to create uncertainty as to the construction of the contract. When read as a whole the policy is unambiguous. "When the language of an insurance policy is unambiguous it should not be strained to impose liability on the insurer." *Davis v. Auto–Owners Insurance Company,* 420 N.W.2d 347, 348 (N.D.1988) (citing *Anderson v. American Standard Insurance Co.,* 293 N.W.2d 878 (N.D.1980)).

We have previously upheld provisions for underinsurance similar to the provisions provided in the policy in this case where the "policy unambiguously stated that its underinsurance coverage applied only when the tort-feasor's liability insurance was less than Auto–Owners' agreed amount of underinsurance coverage." *Davis,* 420 N.W.2d at 348. *Accord Smith v. Atlantic Mut. Ins. Co.,* 155 Wis.2d 808, 456 N.W.2d 597 (1990); *Paape v. Northern Assur. Co. of America,* 142 Wis.2d 45, 416 N.W.2d 665 (Wis.App.1987).

We note that underinsurance coverage has been interpreted to provide coverage in the manner similar to that proposed by the Thompsons as "add on coverage". But those decisions are based primarily upon the application of specific state statutes. *See Auto–Owners Ins. Co. v. Hudson,* 547 So.2d 467 (Ala.1989) (an application of § 32–7–23, Code of Alabama (1975)); *American States Ins. Co. v. Estate of Tollari,* 362 N.W.2d 519 (Iowa 1985) (an application of Iowa Code § 516A.1 (1981)); *Wood v. American Family Mut. Ins. Co.,* 148 Wis.2d 639, 436 N.W.2d 594 (1990) (allowing "add on coverage" in light of the ambiguities in the policy).

Other states, including North Dakota, have either previously applied or are currently applying contrary statutes to reach the result we have reached herein. *See* N.D.C.C., § 26.1–40–15.3 (1989); Minn.Stat. § 65B.49, Subd. 4a (1986).[1] In *Broton v. Western Nat. Mut. Ins. Co.*, 428 N.W.2d 85 (Minn.1988) the Minnesota Supreme Court applied Minn.Stat. § 65B.49, Subd. 4a (1986) which defined the limits of underinsurance coverage as the *"lesser of* the difference between the UIM coverage set out in the policy Declarations or schedules and the amount which has been paid or will be paid to the insured by or for the tort-feasor or tort-feasors, *or* the amount of damages sustained but not recovered."[2] (Emphasis added.) Even states that have adopted statutory schemes which define underinsurance coverage as "add on coverage" allow for a reduction of benefits for amounts previously paid to the insured under various circumstances. *See Poehls v. Guaranty Nat. Ins. Co.*, 436 N.W.2d 62 (Iowa 1989) (benefits payable under the policy were reduced by amounts paid by same insurer under other policies).

We have concluded as we have based upon our analysis of the arguments briefed and orally argued by the Thompsons in this case. Notwithstanding, we deem it appropriate to review other provisions of the policy in light of Justice Meschke's dissent. He asserts that:

> "The majority opinion correctly quotes relevant language from pp. 38–39 and 42–43 of the policy but omits an important part from pp. 40–41 of the policy:
> *Under-insured Motor Vehicle* means a land motor vehicle or attached trailer, the ownership, maintenance or use of which is insured or bonded for bodily injury liability in amounts that:

> 1. meet the requirements of the laws of the state in which *your auto* is mainly garaged; and

> 2. are less than the amount needed to compensate the *insured* for damages."

Although we find no reference to these provisions in the Thompsons' brief, as Justice Meschke deems these provisions crucial, we will discuss them.

The provisions quoted by Justice Meschke do not make reference to the amount of coverage, but merely define what constitutes an underinsured motor vehicle as part of "Other Additional Definitions for Part V" of the policy. We agree that Mark Thompson was struck by an underinsured motorist. But in order to determine the coverage that applies, one must read the provisions which actually refer to "COVERAGE" which are under the heading "Limits of Liability", also under Part V. The limit of coverage is first established on page 42, and is immediately followed by the provisions disclosing how the coverage is to be computed. The dissent attempts to use the definition of what is an underinsured motor vehicle to establish the amount of coverage which is to be paid.

The dissent continues by asserting that when you compare the amount of coverage with an "exclusion clause" an ambiguity results. However, the dissent is not comparing the amount of coverage, but is comparing the definition of an underinsured motor vehicle, with the clauses providing for the computation of coverage; no amount of coverage has been established at the point of reading the definition of an underinsured motorist. Determining that

---

1. *See* note 2 *infra.*

2. Please note that the Minnesota statute, section 65B.49, Subd. 4a, has subsequently been legislatively changed to read:

    "*Subd. 4a. Liability on underinsured motor vehicles.* With respect to underinsured motorist coverage, the maximum liability of an insurer is the amount of damages sustained but not recovered from the insurance policy of the driver or owner of any underinsured at fault vehicle. If a person is injured by two or more vehicles, underinsured motorist coverage is payable whenever any one of those vehicles meets the definition of underinsured motor vehicle in section 65B.43, subdivision 17. However, in no event shall the underinsured motorist carrier have to pay more than the amount of its underinsured motorist limits."

    *See* 1989 Minn. Laws Ch. 213, § 2; 1989 Minn. Laws Ch. 356 § 20; *Gimmestad v. Gimmestad,* 451 N.W.2d 662 (Minn.App.1990).

the liable party was an underinsured motorist does not determine the amount of coverage in this case. Only because the liable party is an underinsured motorist must we determine how much coverage exists in this case. To do that we must proceed to COVERAGE 1–2 at pages 42 and 43 of the policy as we did in the earlier part of our opinion.

The dissent also seems to infer that our decision in *Davis* was premised on provisions which were far less ambiguous. 420 N.W.2d 347. As the author of *Davis*, perhaps Justice Meschke has a memory of the provisions of the policy in *Davis*. Our review of *Davis* discloses no quoted parts of the policy therein involved. *Davis* merely states that the policy was not ambiguous.

The dissent asks us to review the principles which have been previously stated in *AID Ins. Services, Inc. v. Geiger*, 294 N.W.2d 411, 414 (N.D.1980). While those principles are sound, the conclusion in each case depends upon whether or not, upon a reading of the entire policy of insurance, the policy is ambiguous. We must still follow our general rule of construction which states that a contract should be interpreted as a whole. *See* § 9–07–06, N.D. C.C.[3] When read as a whole, the policy is not ambiguous.

For the reasons stated herein, the summary judgment is affirmed.

VANDE WALLE and LEVINE, JJ., concur.

MESCHKE, Justice, dissenting.

Pertinent policy language for under-insured coverage is scattered over six policy pages and interspersed with clauses for uninsured motorist coverage. The majority opinion correctly quotes relevant language from pp. 38–39 and 42–43 of the

policy but omits an important part from pp. 40–41 of the policy:

*Under-insured Motor Vehicle* means a land motor vehicle or attached trailer, the ownership, maintenance or use of which is insured or bonded for bodily injury liability in amounts that:

1. meet the requirements of the laws of the state in which *your auto* is mainly garaged; and

2. are less than the amount needed to compensate the *insured* for damages.

Thus, this policy plainly said that an under-insured motor vehicle was one insured in amounts that "are less than the *amount needed to compensate the insured for damages.*" (My emphasis). In this case, the claim is that the vehicle that struck the insured decedent was insured for $500,000 and less than the amount needed to compensate for the damages to the insured decedent.

Nodak could have agreed that an under-insured vehicle was one which is insured in amounts that "are less than the *coverage under this policy.*" If so, our decision in *Davis v. Auto–Owners Insurance Company,* 420 N.W.2d 347 (N.D.1988) would have been controlling, and then I would agree with today's decision. But that is not Nodak's insuring agreement. Therefore, I respectfully dissent.

Nodak begins its under-insured policy by stipulating that "THERE IS NO COVERAGE UNTIL THE LIMITS OF LIABILITY OF ALL BODILY INJURY ... POLICIES THAT APPLY HAVE BEEN USED UP BY PAYMENTS...." Here, $500,000 was paid by a bodily injury policy that did pay its limits. These injuries are claimed to be more serious, so there clearly would be coverage by Nodak here.

The next pertinent language of Nodak's policy stipulates that an under-insured ve-

---

3. Section 9–07–06 of the North Dakota Century Code reads as follows:

"*9–07–06. Contract interpreted as a whole.* The whole of a contract is to be taken together so as to give effect to every part if reasonably practicable. Each clause is to help interpret the others."

We have recently applied section 9–07–06 stating the following:

"The intention of the parties to a contract must be gathered from the entire instrument, not from isolated clauses, and every clause, sentence, and provision should be given effect consistent with the main purpose of the contract."

*National Bank of Harvey v. Intern. Harvester,* 421 N.W.2d 799 (N.D.1988).

hicle is one "insured ... for bodily injury liability in amounts that ... are less than the amount needed to compensate the insured for damages." The applicable insurance of $500,000 was "less than the amount needed to compensate the insured for damages." Again, there clearly would be coverage by Nodak here.

Further reading the policy, we reach a section on "Limits of Liability." At this point, Nodak's policy says the "amount of coverage is shown on the front of the Declarations under 'I–2—Each Person–Each Accident.'" That amount is $100,000.

Later, when we read an exclusion clause, doubt arises. The exclusion says: "Any amount payable under this coverage shall be reduced by any amount paid or payable to or for the insured ... by or for any person ... who is ... legally liable for the bodily injury to the insured." Thus the same circumstance that defines the amount of coverage also defines the exclusion. There is no way that Nodak would ever have to pay the amount of coverage that it agreed to furnish. This kind of double-talk is ambiguous, and should be construed against the insurer.

The author of today's decision has aptly summarized applicable principles of interpreting an insurance policy:

> [I]t is well-established in North Dakota that, because an insurance policy is a contract of adhesion, any ambiguity or reasonable doubt as to the meaning of the policy is to be strictly construed against the insurer and in favor of the insured. If the language in an insurance contract will support an interpretation which will impose liability on the insurer and one which will not, the former interpretation will be adopted.

*AID Ins. Services, Inc. v. Geiger,* 294 N.W.2d 411, 414 (N.D.1980) (citations omitted). *See also, Emcasco Ins. Co. v. L & M Development, Inc.,* 372 N.W.2d 908 (N.D. 1985). Absent other clear evidence of mutual intention, these standards of interpretation should be followed. *Walle Mutual Insurance Co. v. Sweeney,* 419 N.W.2d 176 (N.D.1988). Therefore, I would reverse the summary judgment and hold that there is

under-insured coverage by Nodak up to $100,000, subject to the plaintiff's proof of damages in an amount exceeding $500,000.

Because I would reverse, I respectfully dissent.

GIERKE, J., concurs.